## 2013-1561

# United States Court of Appeals
# for the Federal Circuit

SCRIPTPRO, LLC and SCRIPTPRO USA, INC.,

*Plaintiffs-Appellants,*

*v.*

INNOVATION ASSOCIATES, INC.,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of Kansas
in case no. 06-CV-2468, Judge Carlos Murguia.*

## BRIEF FOR PLAINTIFFS-APPELLANTS

A. JUSTIN POPLIN – Principal Counsel
R. SCOTT BEELER
JENNIFER M. HANNAH
LATHROP & GAGE LLP
10851 Mastin Blvd Bldg 82, Ste 1000
Overland Park, KS 66210-1669
Phone: (913) 451-5100
Fax: (913) 451-0875
Email: jpoplin@lathropgage.com
        sbeeler@lathropgage.com
        jhannah@lathropgage.com

TRAVIS W. MCCALLON
LATHROP & GAGE LLP
2345 Grand Blvd, Ste 2400
Kansas City, MO 64108-2684
Phone: (816) 292-2000
Fax: (816) 292-2001
Email: tmccallon@lathropgage.com

*Counsel for Plaintiffs-Appellants*

November 7, 2013



## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Petitioner certifies the following:

1.      The full names of every party represented by the undersigned counsel in this case are: ScriptPro, LLC and ScriptPro USA, Inc.

2.      ScriptPro LLC, and ScriptPro USA, Inc. are the names of the real parties in interest.

3.      ScriptPro, LLC and ScriptPro USA, Inc. have no parent companies, and no publicly held corporation owns 10% or more of the stock of ScriptPro, LLC or ScriptPro USA, Inc.

4.      The names of the law firms and the partners and associates that have appeared for ScriptPro, LLC and ScriptPro USA, Inc. in the district court or are expected to appear for the same in this Court are: R. Scott Beeler, David V. Clark, Matthew K. Corbin, Brian C. Fries, Jennifer M. Hannah, Gerald M. Kraai, A. Justin Poplin, and Travis W. McCallon, all of Lathrop & Gage LLP.

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ................................................. vii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUE...............................................................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF THE FACTS ...............................................................5

SUMMARY OF THE ARGUMENT ......................................................9

ARGUMENT ........................................................................................10

   A. Standard of Review.......................................................................10

   B. The Original Claims of the '601 Patent Alone Provide Written
      Description Support for Claims without Sensor Limitations ........12

      1. Certain Original Claims of the '601 Patent, Which Are Part of the
         Specification, Contained No Sensor Limitations ....................12

      2. The District Court Misapprehended ScriptPro's Argument
         Concerning This Issue .............................................................17

   C. Neither the Nature of the Invention Itself nor the Language of the
      Remainder of the Specification Require Sensors .........................21

   D. The District Court Overstepped Its Bounds on Summary Judgment............29

      1. The District Court Applied Erroneous Written Description and
         Summary Judgment Standards ................................................29

      2. The District Court Erroneously Rejected Testimony from
         ScriptPro's Expert .................................................................33

CONCLUSION AND STATEMENT OF RELIEF ...............................37

ADDENDUM

June 26, 2012 Court Memorandum and Order Regarding
Summary Judgment (Docket No. 312-00)....................................................A1

U.S. Patent No. 6,910,601 .........................................................................A97

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
   659 F.3d 1121 (Fed. Cir. 2011) ................................................................27

*Ariad Pharm., Inc. v. Eli Lilly and Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ........................................... 16, 18, 21

*Ateliers de la Haute-Garonne v. Broetje Automation USA Inc.*,
   717 F.3d 1351 (Fed. Cir. 2013) ................................................................11

*Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*,
   715 F.3d 1231 (10th Cir. 2013) ................................................................11

*Broadcast Innovation, L.L.C. v. Charter Communications, Inc.*,
   420 F.3d 1364 (Fed. Cir. 2005) ................................................................11

*Capobianco v. City of New York*,
   422 F.3d 47 (2d Cir. 2005) ................................................................36

*Cordis Corp. v. Medtronic AVE, Inc.*,
   339 F.3d 1352 (Fed. Cir. 2003) ........................................... 27, 28, 31

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
   635 F.3d 1373 (Fed. Cir. 2011) ........................................... 11, 13, 14, 15, 16, 18

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
   323 F.3d 956 (Fed. Cir. 2002) ................................................................16

*E–Pass Techs., Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003) ................................................................25

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005) ........................................... 19, 20

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   645 F.3d 1336 (Fed. Cir. 2011) ................................................................10

*In re Koller*,
   613 F.2d 819 (CCPA 1980) ................................................................13

iv

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ...................................................... 20, 21

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009) ...................................................... 31, 34

*Maytag Corp. v. Electrolux Home Products, Inc.*,
   448 F. Supp. 2d 1034 (N.D. Iowa Sept. 8, 2006) .......................... 36, 37

*Nazomi Commun., Inc. v. Arm Holdings, PLC*,
   403 F.3d 1364 (Fed. Cir. 2005) ...........................................................29

*Novartis Corp. v. Ben Venue Laboratories, Inc.*,
   271 F.3d 1043 (Fed. Cir. 2001) ...........................................................11

*SRI Intern. v. Matsushita Elec. Corp. of America*,
   775 F.2d 1107 (Fed. Cir. 1985) ...........................................................31

*Thomas v. U.S. Dept. of Energy*,
   719 F.2d 342 (10th Cir. 1983) ............................................................35

*Virginia Panel Corp. v. MAC Panel Co.*,
   133 F.3d 860 (Fed. Cir. 1997) ...................................................... 25, 30

*Wayman v. Amoco Oil Co.*,
   923 F. Supp. 1322 (D. Kan. Jan. 26, 1996) ......................................36

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
   683 F.3d 1356 (Fed. Cir. 2012) ...........................................................19

**Statutes**

28 U.S.C. § 1295(a)(1) ...............................................................................1

28 U.S.C. § 1338(a) ...................................................................................1

35 U.S.C. § 112 ................................................................................. 1, 2, 4

35 U.S.C. § 271 .................................................................................. 1, 11

**Rules**

Fed. R. App. P. 4(a)(2) ........................................................... 1

Fed. R. Civ. P. 56(a) ....................................................... 11, 32

Fed. R. Civ. P. 56(e)(1) ......................................................... 36

**Other Authorities**

10A Charles Alan Wright et al., Federal Practice & Procedure
 § 2722 (3d ed. 1998) ......................................................... 35

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from the same civil action or proceeding in the lower tribunal was previously before this or any other appellate court.

No other cases will be affected by the Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The district court possessed subject matter jurisdiction over ScriptPro LLC's and ScriptPro USA Inc.'s (collectively "ScriptPro") claims pursuant to 28 U.S.C. § 1338(a), as ScriptPro asserted claims of patent infringement pursuant to 35 U.S.C. § 271. Jurisdiction over ScriptPro's appeal is proper pursuant to 28 U.S.C. § 1295(a)(1). On June 26, 2012, the district court granted partial summary judgment of invalidity under 35 U.S.C. § 112, ¶ 1 with respect to all asserted claims (1, 2, 4, and 8) of ScriptPro's U.S. Patent No. 6,910,601. The district court dismissed the remainder of the action on July 12, 2013, at which time its prior summary judgment order became final and appealable. ScriptPro timely filed its notice of appeal on August 9, 2013. *See* Fed. R. App. P. 4(a)(2); (*see* A68).

# STATEMENT OF THE ISSUE

The benefits and purposes of the invention of ScriptPro's U.S. Patent No. 6,910,601—which is a collating unit used for storing prescription containers—do not relate to sensors or sensing technology. As such, numerous original claims of the patent did not require sensors. The specification likewise reveals that sensors are not critical to or required for the invention, but are instead redundant features even in the preferred embodiments. Did the district court err in invalidating the asserted claims on the basis that the patent lacks written description support for claims that do not require sensors?

1

## STATEMENT OF THE CASE

ScriptPro initiated this action in the United States District Court for the District of Kansas on October 26, 2006, against Innovation Associates, Inc. ("Innovation"), asserting infringement of U.S. Patent No. 6,910,601 (the "'601 Patent"). (A2077, A2082). On December 30, 2011, ScriptPro and Innovation filed cross-motions for summary judgment. (*See* A52-53). ScriptPro sought summary judgment of infringement, as well as summary judgment on Innovation's tortious interference counterclaims. (*See* A1798). Innovation sought summary judgment on a number of issues, including that the asserted claims of the '601 Patent are invalid pursuant to 35 U.S.C. § 112, ¶ 1 for lack of written description support. (*See* A1418-19).

On the issue of written description support, Innovation argued that the asserted claims of the '601 Patent "cover a collating unit with or without sensors that automatically stores prescription containers," but further argued that "the specification indicates that the inventors were in possession of an invention with a much narrower scope—namely, an invention that automatically stores containers by utilizing sensors." (A1839). Although Innovation through its expert and factual contentions conceded that the original versions of the asserted claims did not require sensors and that the '601 Patent has always simultaneously included

2

claims that require sensors and claims that do not require sensors, it did not address these facts in its brief.

ScriptPro in its opposition keyed on these related points, however, arguing that because the '601 Patent contains claims that require sensors as well as claims that do not require sensors, the absence of a sensor limitation in some of the claims was not an oversight but is evidence that the inventors have always purposefully had in mind so-called sensorless (or sensor-optional) collating units. (*See* A3168). ScriptPro also expressly argued that Innovation "entirely ignored passages of the '601 Patent's specification and presented the Court with an incomplete picture of the '601 Patent." (A3168). It cited a number of passages from the specification revealing that sensors are an unnecessary, redundant feature even in the preferred embodiments, and it provided testimony from its expert to show that the specification supports sensor-optional collating units. (*See* A3168).

In its Memorandum and Order on the parties' motions for summary judgment, the district court rejected ScriptPro's argument concerning the '601 Patent's inclusion of both claims that require sensors and claims that do not, stating that it is "immaterial" that the omission of a sensor limitation from some claims may have been purposeful. (A9). Apparently misunderstanding the connection this argument has to the patent's original claims, however, the court also went out of its way to opine that ScriptPro did not "suggest" that the original

3

claims of the '601 Patent satisfy the written description requirement. (A8 n. 3, A9).

The district court also dismissed the specification passages that ScriptPro cited, on the apparent basis that they all included the term "sensor(s)," and thus "do[] not clearly describe or suggest a unit without sensors." (A9). The court further disregarded relevant testimony from ScriptPro's expert. (*See* A10-11).

As a result, the district court granted summary judgment in favor of Innovation on the issue of written description support, and invalidated all of the asserted claims of the '601 Patent under 35 U.S.C. § 112, ¶ 1. (A12, A20). It also denied ScriptPro's motion for summary judgment. (A20).

The action proceeded on Innovation's tortious interference counterclaims, but on the eve of trial, Innovation voluntarily moved to dismiss those claims with prejudice, and the Court granted Innovation's motion. (A67-68).

ScriptPro timely filed its notice of appeal on August 9, 2013. (A68). On appeal, only the district court's summary judgment order on the issue of written description support is at issue.

## STATEMENT OF THE FACTS

ScriptPro develops and provides state-of-the-art, robotics-based pharmacy management and workflow systems. ScriptPro owns the '601 Patent, which issued on June 28, 2005 out of a non-provisional application filed July 8, 2003.[1] (A69). The patent is titled "Collating Unit for Use with a Control Center Cooperating with an Automatic Prescription or Pharmaceutical Dispensing System" and, as the title implies, is directed to a collating unit used for storing filled prescription containers dispensed from an automatic dispensing system. (*See* A69). ScriptPro sells and provides support for collating units that embody the invention disclosed in the '601 Patent. (*See* A92, ¶7).

The invention of the '601 Patent addressed a number of problems with prior art automatic dispensing systems, though none of those problems or solutions related to the use of sensors or sensing technology. (*See* A79-80, at 1:24 – 4:10). Rather, the primary advantages of the claimed invention relate more directly to the invention's purpose of ***storing*** prescription containers. For example, while prior art systems were limited to storing only one prescription container per slot/compartment, the collating unit of the '601 Patent can store more than one container in a holding area. (A80, at 3:4-6, 3:65-66, 4:13-24). In addition, unlike prior art systems, the collating unit of the '601 Patent stores containers based upon

---

[1] The inventors filed a provisional application on July 8, 2002. (A69).

an algorithm keyed to a patient's name, rather than a prescription number.  (A80, at 3:21-35, 4:13-24).  The invention is also capable of simultaneously storing unit-of-use packages and filled prescription vials, a capability absent in the prior art.  (A80, at 3:49-4, 4:13-24).  As a result of these advances (and others), the patent's inventive collating unit is operable to "associate a stored container with a patient based on the patient's name" and automatically "collate and store multiple containers for a patient within the same area," allowing for easier and more accurate retrieval of a patient's prescription containers.  (*See* A81, at 6:35-38).

All of the claims appearing in the '601 Patent's original application issued without rejection or amendment.  (*See* A3289; *see also* A1726, at ¶ 6; A2489, at ¶ 32; A2490, at ¶ 35).  Consistent with the fact that the '601 Patent does not distinguish itself from the prior art based on the presence or absence of sensors, certain of the '601 Patent's original claims (1-6, 8) contained no limitation requiring sensors, while other claims (7, 9-21) contained a limitation requiring a plurality of sensors for sensing the presence of containers within the unit.  (A4055-60).  Original independent claim 1 (as filed and issued), for example, did not require sensors:

> 1.   A collating unit for automatically storing prescription containers dispensed by an automatic dispensing system, the collating unit comprising:
> a storage unit for storing the containers delivered by an infeed conveyor;

6

a plurality of holding areas formed within the storage unit for holding the containers;

a plurality of guide arms mounted within the storage unit and operable to maneuver the containers from the infeed conveyor into the plurality of holding areas; and

a control system for controlling operation of the infeed conveyor and the plurality of guide arms.

(A4055; A86, at 15:57 – 16:2). Original dependent claim 7 (as filed and issued), however, added sensors to the collating unit of claim 1:

7. The collating unit as claimed in claim 1, further including a plurality of sensors mounted in the storage unit for sensing the presence of containers stored in the collating unit.

(A4056; A86, at 16:30-33).

Defendant-Appellee Innovation also manufactures and sells pharmacy automation systems, including specifically its PharmASSIST ROBOTx unit, which Innovation has manufactured and sold since August 22, 2005. (*See* A2082). Subsequent to Innovation's release of the ROBOTx, ScriptPro initiated this action asserting that the ROBOTx infringed claims 1, 2, 4, and 8 of the '601 Patent. (A2077, A2082).

On August 17, 2007, after ScriptPro initiated the action, Innovation requested *inter partes* reexamination of claims 1-3, 7-9, and 13-16 of the '601 Patent, and the PTO granted the request on November 14, 2007. (A1803, at ¶¶ 10-11). Innovation subsequently sought and obtained a stay of the district court action pending reexamination. (*See* A31, at No. 33; A3160, at ¶ 165). Over three years later, the PTO ultimately **confirmed** claims 8, 9, and 13-16 without amendment,

**confirmed** claims 1, 2, and 4 as amended/rewritten[2] by ScriptPro during reexamination, and **confirmed** claim 7 as dependent on amended claim 1. (A88, A90). ScriptPro's amendments to claims 1, 2, and 4 during reexamination did not involve sensors. (*See* A90; A1808, at ¶¶ 39, 40). Reexamined claim 1, for example, now reads as follows[3]:

> 1. A collating unit [for automatically storing] *configured to automatically store therein* prescription containers dispensed by an automatic dispensing system, the collating unit comprising:
>
> a storage unit [for storing the] *configured to store in an upright configuration a plurality of prescription* containers delivered by an infeed conveyor;
>
> a plurality of holding areas formed within the storage unit for holding the *plurality of prescription* containers *in an upright configuration*;
>
> a plurality of guide arms mounted within the storage unit and operable to maneuver the *plurality of prescription* containers from the infeed conveyor into the plurality of holding areas; and
>
> a control system for controlling operation of the infeed conveyor and the plurality of guide arms;
>
> *wherein the storage unit includes a frame raised above and substantially surrounding at least a portion of at least one of the infeed conveyor or another conveyor, the plurality of holding areas being formed within the frame for holding the plurality of prescription containers*.

(A90, 1:25-46). Thus, reexamined claims 1, 2, and 4 (as well as claim 8), like their original counterparts, still do not require sensors.

---

[2] ScriptPro rewrote claim 4 in independent form, but did not substantively amend the claim. (*See* A90, at 2:21-48).

[3] Brackets ("[ ]") indicate deletions, while *italics* indicate additions.

## SUMMARY OF THE ARGUMENT

The issue of whether the '601 Patent contains written description support for claims without a sensor limitation is ***not*** amenable to summary judgment, for numerous reasons—all of which the district court seems to have gone out of its way to overlook. First, the original, as-filed versions of the asserted claims of the '601 Patent did not require sensors. Those original claims are a part of the specification and, as such, provide sufficient written description support for current claims that do not require sensors. These claims alone, which this Court may properly consider regardless of the district court's refusal to do so, therefore create a genuine issue of fact that prevents summary invalidation of the asserted claims.

Second, the remainder of the specification clearly conveys that sensors are not critical to the invention and that the inventors accordingly did not intend sensors to be required in all embodiments. Indeed, the purposes and benefits of the invention have nothing to do with sensors, and the descriptive portions of the specification contain no language that limits the invention to collating units with sensors. Rather, the specification clearly reveals that sensors are a redundant feature even in the preferred embodiments, and it explains that other components of the invention provide and track the same information—and more—as the sensors. At a minimum, and in addition to the original claims, these disclosures also raise genuine issues of fact that prevent summary judgment.

Unfortunately, the district court did not assess what the language of the specification reasonably conveys, but instead effectively looked only to whether the specification explicitly describes a collating unit without sensors. This *in haec verba* analysis was not only improper, it also lead the court to require far too much of ScriptPro on summary judgment. In fact, because nothing short of a specification passage explicitly describing a collating unit without sensors could have caused the court to recognize any issues of fact, the court made summary judgment a foregone conclusion. The court's resulting summary invalidation of the asserted claims does not remotely reflect the true purpose of the written description requirement or the deference due a validly issued patent. This Court should therefore reverse.

## **ARGUMENT**

### A. **Standard of Review**

"The test under the written description requirement is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011) (internal quotation omitted). "[W]hether a claim is supported by an adequate written description is a factual inquiry," and "the accused [infringer] must show that the claims lack a written description by clear and convincing evidence."

*Id.* Thus, "[t]o invalidate a patent on summary judgment, the moving party must submit such clear and convincing evidence of invalidity that no reasonable trier of fact could find otherwise." *Ateliers de la Haute-Garonne v. Broetje Automation USA Inc.*, 717 F.3d 1351, 1356 (Fed. Cir. 2013).

"A district court's grant of summary judgment on written description is reviewed *de novo.*"[4] *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011). In other words, this Court "review[s] without deference whether disputed material facts exist, and review[s] independently whether the prevailing party is entitled to judgment as a matter of law." *Novartis Corp. v. Ben Venue Laboratories, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should view the facts and draw any reasonable inferences from the facts in the light most favorable to the non-movant, in this case ScriptPro. *Brecek*, 715 F.3d at 1237.

---

[4] "Under the law of the [T]enth [C]ircuit, the grant or denial of a summary judgment motion is reviewed de novo." *Broadcast Innovation, L.L.C. v. Charter Communications, Inc.*, 420 F.3d 1364, 1366 (Fed. Cir. 2005) (citation omitted)); *see Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1237 (10th Cir. 2013) (same).

11

**B.    The Original Claims of the '601 Patent Alone Provide Written Description Support for Claims without Sensor Limitations**

As explained below, the original versions of the asserted claims of the '601 Patent themselves provide written description support for the current versions of those same claims.  As such, the district court should not have granted summary judgment for lack of written description.

**1.    Certain Original Claims of the '601 Patent, Which Are Part of the Specification, Contained No Sensor Limitations**

The original, as-filed versions of the asserted claims of the '601 Patent did not recite any sensor limitations—*i.e.*, they made sensors optional.  (A4033, A4055-57).  Indeed, the inventors used permissive language in referencing sensors even in their provisional application, explaining to the PTO that the envisioned units "***may also*** contain sensor(s)."  (A4483, 4485 (emphasis added)).

Innovation does not dispute these facts.  Its own expert, after reviewing the file history of the '601 Patent, explained that the claims appearing in the original patent application were the same as the original, as-issued claims of the patent:

> It is my understanding that the inventors of the '601 patent obtained a first action allowance of the claims of the patent.  As such, the inventors made no arguments to the PTO in support of the claims during the original prosecution of the '601 patent.  Nor did the patentees make any amendments to the claims during the original prosecution of the '601 patent.

(A2490, at ¶ 35; *see also* A3289).  And Innovation in its motion for summary judgment emphasized that the as-issued claims—and thus the originally filed

claims—contained no sensor limitations: "[t]here is no claim limitation requiring a plurality of sensors in original claims 1 or 2 or reexamined claims 1 or 2 of the '601 patent." (A1808, at ¶ 39). Innovation further emphasized the same point by noting that the reexamination it instituted did not alter the original claims as they pertained to sensors: "[d]uring the reexamination proceeding ScriptPro did not delete from original claims 1 and 2 any claim limitation requiring a plurality of sensors." (A1808, at ¶ 40). ScriptPro's expert agreed with Innovation that, even after reexamination, claims 4 and 8 "are the same as when they were originally filed," and thus do not require sensors. (A4535, at ¶ 35). In short, both parties agree that claims lacking sensor limitations have always been a part of the '601 Patent, from the date of the patent's underlying application through the patent's reexamination.

As this Court and its predecessor court have long-recognized, "[o]riginal claims are part of the specification and in many cases will satisfy the written description requirement." *Crown Packaging*, 635 F.3d at 1380; *see In re Koller*, 613 F.2d 819, 823 (CCPA 1980) ("[O]riginal claims constitute their own description."). This case is one of the "many cases" in which the original claims satisfy the written description requirement, as the *Crown Packaging* decision reveals.

The two patents at issue in *Crown Packaging* shared a common specification that described two ways to save metal when seaming can bodies and can ends: increasing the slope of the can end chuck wall and limiting the width of the reinforcing bead.    635 F.3d at 1375-77.    The asserted claims covered an improvement in metal usage by increasing the slope of the chuck wall, but contained no additional limitation requiring a narrowing of the width of the reinforcing bead.  *Id.* at 1379.  The defendant argued that while the specification described increasing the slope of the chuck wall ***and*** limiting the width of the reinforcing bead, it did not describe increasing the slope of the chuck wall ***without also*** limiting the width of the reinforcing bead.  *See id.* at 1378, 1379.  The district court agreed, and therefore held the asserted claims invalid as failing to satisfy the written description requirement.  *Id.* at 1379.

This Court reversed on appeal.    In doing so, it first emphasized that "[o]riginal claims are part of the specification," and noted that certain of the patents' original, as-filed claims contained no limitation requiring a narrowing of the width of the reinforcing bead.  *Id.* at 1380.  Rather, the Court explained, the plaintiff added the limitation requiring a narrowing of the width of the reinforcing bead only to certain dependent claims.  *Id.* at 1381.  As this Court recognized, this added limitation in the dependent claims "would not be needed" if the inventors had in mind that in all cases the width of the reinforcing bead should be narrowed.

*Id.*   As a result, the original claims that contained no limitation requiring such a narrowing "clearly showed that the applicants recognized and were claiming an improvement in metal usage by increasing the slope of the chuck wall . . . without any additional limitation of narrowing the width of the reinforcing bead." *Id.* The Court therefore held that there was sufficient written description support for the asserted claims. *Id.*

*Crown Packaging* is directly on-point. Just as the defendant there argued that the specification supported metal usage improvements requiring a narrowing of a reinforcing bead but not improvements that do not require such a narrowing, Innovation here argues that the '601 Patent's specification supports collating units requiring sensors but not units that do not require sensors. And just as certain of the original claims of the patents in *Crown Packaging* did not require a narrowing, certain of the original claims of the '601 Patent did not require sensors. (*See* A4055-57; A1808, at ¶¶ 39, 40). Similarly, while the inventors in *Crown Packaging* included a limitation requiring a narrowing of a reinforcing bead via dependent claim, the inventors of the '601 Patent included sensor limitations in their original application via both independent and dependent claims. (*See* A4055-57; *see also* A86, at 15:57 – 16:2, 16:30-33). Thus, as this Court reasoned in *Crown Packaging*, the inventors of the '601 Patent would not have added the sensor limitations to certain claims if they had in mind that in all cases the claimed

collating units would require sensors. The original claims of the '601 Patent therefore clearly show, as "many original claims do," that the inventors had in mind the invention as claimed in the asserted claims—*i.e.*, a sensor-optional collating unit. *See Crown Packaging*, 635 F.3d at 1381.

Just as this case is like *Crown Packaging*, it is conspicuously unlike other cases in which this Court has held that original claims alone do not satisfy the written description requirement. Those case are primarily complex chemical cases involving "generic claim[s] [that] define the boundaries of a vast genus of chemical compounds" using only functional language. *Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1349 (Fed. Cir. 2010); *see Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968-69 (Fed. Cir. 2002). The claims here, like the claims in *Crown Packaging* (635 F.3d at 1380), are not broad genus claims or function claims simply describing a desired result. (*See e.g.* A86, at 15:57 – 16:2; A90, at 1:25-46).

In sum, the original claims of the '601 Patent alone are sufficient to satisfy the written description requirement with respect to the asserted claims. At bare minimum, the fact that certain of the '601 Patent's original claims did not contain sensor limitations is sufficient to create a genuine issue of fact concerning whether the '601 Patent contains written description support for claims that do not contain sensor limitations.

16

## 2. The District Court Misapprehended ScriptPro's Argument Concerning This Issue

As noted above, ScriptPro expressly relied upon the '601 Patent's inclusion of a sensor limitation in claims 7, 9, 13, 20, and 21 in arguing below that "the inventors did not simply overlook sensors, but rather purposefully decided to omit the sensors from claims 1, 2, 4, and 8." (A3168). Not only did the district court seemingly ignore the substance of this argument—asserting that whether the inventors purposefully omitted sensor limitations is "immaterial"—the court also failed to appreciate the inherent connection of the argument to the nature of the '601 Patent's original claims. (A9). Indeed, despite ScriptPro's purposeful omission argument and the fact that ScriptPro placed the original claims into the summary judgment record (*see* A4055-57), the court did not address the original claims on the apparent belief that ScriptPro did not "suggest" that those claims themselves satisfy the written description requirement. (A8 n. 3).

But the purposeful omission argument that ScriptPro did make is ***the same*** argument that the district court claimed ScriptPro did not "suggest," even if not presented in the form the district court seemingly expected. The distinction ScriptPro drew between claims with a sensor limitation and claims without a sensor limitation necessarily pertains to the original claims as well as the current claims. Indeed, the only time at which a purposeful omission by the inventors would be relevant in the context of the written description requirement is the filing

17

date of the patent's application, as "written description is determined as of the filing date." *Ariad*, 598 F.3d at 1355. And, in any event, given that it is undisputed that the original claims of the '601 Patent issued without amendment or rejection and that ScriptPro did not delete sensor limitations during reexamination, the '601 Patent's original filing date is the ***only*** time at which the inventors could have "purposefully omitted" sensor limitations from the claims.[5] (*See* A3289; A4033; A2490, at ¶ 35; A4535, at ¶ 35).

Moreover, the force of ScriptPro's assertion that the inventors purposefully omitted sensors from the asserted claims is based on the reasoning that the inventors would not have added sensor limitations to only certain claims if they had in mind that in all cases the claimed collating units would require sensors. This is the same reasoning the Court employed in *Crown Packaging* when it held that the original claims of the patents at issue there indicated that the inventors had in mind the invention as claimed. Thus, the district court was wrong not to

---

[5] Innovation itself recognized that ScriptPro's argument inherently related to the patent's original claims. In its reply memorandum, Innovation attempted to refute the argument, asserting that the fact that the inventors purposefully omitted sensors from some claims "only serves to confirm that the inventors ***sought*** broader claim coverage than what is disclosed in the written description." (A4250 (emphasis added)). As explained above, the only time at which the inventors "sought" claims without sensor limitations was the original filing date.

Had the district court understood what Innovation plainly understood, it would not have incongruously rejected ScriptPro's argument as "immaterial," on the one hand, and intentionally and expressly refrained from addressing the effect of the original claims, on the other.

consider ScriptPro's argument in its full context, including the context of the original claims of the '601 Patent.

Regardless of the district court's treatment of this issue, however, there is no barrier to this Court's consideration of the original claims of the '601 Patent on appeal, as this Court's review is not so limited as to require parties to argue positions and concepts in the exact manner in which they presented them below. In *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251-52 (Fed. Cir. 2005), for example, the defendant before the district court advocated a two-step claim construction wherein the steps were found in the claimed functions, while on appeal it advocated a two-step construction wherein the steps were found in the corresponding structure. The Court explained that the defendant's "claim construction theory on appeal is at least slightly different—in form if not in ultimate conclusion—from its position below." *Id.* at 1251. Nevertheless, the Court found that the defendant's change in theory did not significantly alter its ultimate two-step construction, and that the defendant was thus urging "the same concept" on appeal as it had urged below. *Id.* at 1251-52. The Court therefore found no waiver. *Id.* at 1252; *see also Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1360 n.3 (Fed. Cir. 2012) (finding that patentee did not waive challenges to summary judgment order because it presented "the essence" of

its appeal arguments below, even if below such arguments were "much abbreviated").

Similarly, in *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001), another claim construction case, the Court explained that "waiver is limited in its application" and attaches only to claims or issues, not "specific evidentiary argument[s]." *Id.* at 1346. And because the "issue" for purposes of a waiver analysis in the context of claim construction is the district court's ruling on claim construction itself, the Court explained, waiver "has not been invoked . . . to prevent a party from clarifying or defending the original scope of its claim construction, or from supporting its existing claim construction position with new citations to the specification." *Id.*

As explained above, ScriptPro's purposeful omission argument from its summary judgment opposition is effectively the same as its argument on appeal that the original claims of the '601 Patent provide written description support for the asserted claims. At worst, and like the arguments at issue in *Harris*, ScriptPro's argument on appeal is only "slightly different—in form if not in ultimate conclusion—from its position below." *See* 417 F.3d at 1251. As such, even at the level of specific evidentiary arguments, ScriptPro is urging "the same concept" here that it urged to the district court below. *See id.* at 1251-52.

In any event, as *Interactive Gift Express* teaches, the issue on appeal here is the district court's written description ruling, not any specific evidentiary argument for or against written description support in the '601 Patent. ScriptPro explicitly argued below that there is "ample disclosure in the patent specification" to support the asserted claims, and that Innovation "has entirely ignored passages of the '601 Patent's specification and presented the Court with an incomplete picture of the '601 Patent." (A3167-68). *All* of ScriptPro's arguments on appeal are consistent with these positions. Thus, as the *Interactive Gift Express* Court recognized, ScriptPro may clarify and defend its written description positions on appeal with new citations to the specification—including citations to the original claims of the '601 Patent, which are part of both the specification and the summary judgment record. ScriptPro's arguments concerning the original claims of the '601 Patent are therefore proper—and meritorious—and this Court should consider them.

## C. Neither the Nature of the Invention Itself nor the Language of the Remainder of the Specification Require Sensors

It is not surprising that the original claims of the '601 Patent made sensors optional, given the nature of the claimed invention and the language of the remainder of the specification, neither of which compel the inclusion of sensors.

"[D]etermining whether a patent complies with the written description requirement will necessarily vary depending on the context." *Ariad*, 598 F.3d at 1351. As such, the level of detail required from a specification "varies depending on the nature and scope of the claims and on the complexity and predictability of

the relevant technology." *Id.* (citation omitted). Here, the '601 Patent is not directed to **sensing** or sensor technology, but to a collating unit for **storing** prescription containers. (*See e.g.* A69; A79, at 1:19-22; A80, at 4:16-21; A82, at 7:25-31; *see* A3158, at ¶ 151). As explained above, none of the problems or needs that the claimed invention purports to address involve sensing or sensors. (*See* A80, at 3:59 – 4:11). Similarly, the specification does not distinguish the claimed invention from the prior art on the basis of the presence of sensors or sensing. (*See* A80, at 3:4-58). Neither are the claims otherwise subject to a wide degree of variation, as they are not broad genus claims or claims directed to complex chemicals or a technology subject to frequent change.

Against this backdrop, there is simply nothing in the '601 Patent's specification that indicates that the inventors possessed only a collating unit that must include sensors. Indeed, the specification contains no language that unambiguously limits the invention to collating units with sensors. And nowhere does the specification refer to sensors as integral or mandatory, nor does the specification use any other adjective to elevate their importance. To the contrary, although the specification refers to sensors in the preferred embodiment(s),[6] those

---

[6] The patent formally describes two preferred embodiments. (*See* A85-86, at 14:45 – 15:29). The second preferred embodiment contains no reference to sensors, although the specification explains that "the collating units **10**a, **10**b of the second preferred embodiment are substantially similar to the collating unit **10** of the first preferred embodiment." (A85, at 14:50-53).

descriptions actually reveal that sensors are a redundant feature in those embodiments.

Because one of the primary goals of the invention is to "associate a stored container with a patient based on the patient's name" and then "collate and store multiple containers for a patient within the same area," the collating unit's system must know exactly where *a specific patient's* prescription containers are at all times. (*See* A81, at 6:35-38). The sensors, however, function only to "determine the presence of a container within the collating unit"—without regard to the identity of a container. (*See e.g.* A80, at 4:61-62; A84, at 11:66-67). As such, the sensors cannot provide the unique information required in order for the system to know where a specific patient's prescription containers are located. Instead, the specification expressly explains that the unit's memory stores this information without the assistance of sensors:

> As containers are stored in the collating unit **10**, the control system **28** of the collating unit **10** stores such information in the memory **110**. An operator of the collating unit **10** may at any time determine which containers are currently stored in the collating unit **10** and the location of the containers in the collating unit **10**.

(A84, at 12:45-51; *see* A3132, at ¶ 49; A3136, at ¶ 59; A3142, at ¶ 95). This description of the sensor-independent way in which the units determine the location of a container is consistent with the specification's further explanation that the sensors function merely to "*confirm* the presence of the container" within the

23

unit, as sensors can "confirm" the presence of a container only if the system has already determined where the container is located. (A84, at 12:28-31 (emphasis added); *see* A3132, at ¶ 51; A3141, at ¶ 93).

Similarly, the specification explains that the control system tracks the retrieval of prescription containers from the collating unit's holding area and is thus able to determine when all containers have been retrieved from the holding area's slots—without the use of sensors:

> Upon retrieval or removal of the container from the holding area **22**, the control system **28** closes the script to indicate the container for the patient has been retrieved. If the patient has more than one container, the control system **28** does not close the script until all containers for the patient have been retrieved from the collating unit **10**.

(A85, at 14:27-32; *see* A3132, at ¶ 49; A3136, at ¶ 59; A3142, at ¶ 95). Thus, the sensors in the preferred embodiments are a mere "security feature," providing information that is already known by the control system: "As a security feature, after retrieval of the containers from the holding area **22**, the sensors **26** associated with the holding area **22** . . . determine if any container is located in the area **22**."[7]

(A85, at 14:32-37; *see* A3132, at ¶ 50). Consistent with this purpose, if the sensors detect a container they trigger the control system to cause "an error message to be

---

[7] This is the same optional purpose the inventors envisioned for the sensors even in their provisional application, where they explained that the units "may also contain sensor(s) so the system will know when no vials are present in the holding area." (A4485).

displayed on the display" in order to "alert[] a busy operator that not all container for the patient were retrieved." (A85, at 14:39-40).

Far from limiting the invention of the '601 Patent to a collating unit with sensors, these passages reasonably convey that the inventors had possession of sensor-optional collating units. As an initial matter, the mere fact that the specification describes sensors in connection with the preferred embodiments of the invention does not indicate a lack of support for claims that contain no sensor limitation, as "it is well-settled that device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 866 (Fed. Cir. 1997); *see E–Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.") (*see* A3130-32, at ¶ 47).

Perhaps more importantly, because the sensors play a redundant role even in the preferred embodiments—and because neither the specification nor the claims mandate redundancy—it is no stretch to conclude that the preferred embodiments themselves convey that the inventors had in mind embodiments in which sensors were absent (or optional). (*See* A3132-33, at ¶¶ 49-54; A3136, at ¶ 59). Indeed, based on the specification's descriptions, ScriptPro's expert, Dr. Terry Faddis,

opined in his deposition and in his report that a person of ordinary skill in the art would recognize that one could use the system's memory to detect the presence of containers without using sensors.[8] (A2065, at 78:25 – 79:5 ("You just store memory whether it's full or not. It's simple."); A3191-92, at ¶ 27; *see* A3142, at ¶ 96). Thus, as he opined, "one of ordinary skill in the art would understand that the inventors had a collating device that was operable without sensors, but could use sensors to confirm operating status." (A3191-92, at ¶ 27). That the original versions of the asserted claims did not require sensors merely confirms all of this.

Tellingly, although Innovation argued below that sensors are integral to the invention of the '601 Patent and that the specification does not identify any other components capable of determining the location of containers, its expert, Dr. Janet, refused to engage the specification's explanation that sensors are a mere "security feature" in the preferred embodiments. For example, although Dr. Janet conceded that the preferred embodiments utilize sensors as a security feature, he interpreted "security feature" to mean only "feature," thereby reading the operative descriptor right out of the specification. (A3268, at 107:15-17, 108:22-25). In addition, he could only answer "I don't know" when asked why the sensors would trigger an error message upon detecting a container if, as he claimed, there were no other way

---

[8] While relevant and helpful, ScriptPro submits that Dr. Faddis' testimony is not necessary in order for this Court to reverse, as the disclosures of the specification alone create genuine issues of fact on the issue.

of determining the location of containers. (A3268-69, at 109:11 – 110:4). Innovation simply failed to account for what the specification actually says about the redundant nature of the sensors.

While it is true that the specification also identifies sensors as part of the "present invention" in the Abstract and Summary of the Invention, in each instance it does so in the context of listing what "broadly comprises" the invention. (*See* A69; A80, at 4:25-31; *see* A3129-30, at ¶ 44). As such, there are other components apart from sensors—*e.g.*, "a base" and a "collating unit conveyor"— that appear in these broad lists that, like sensors, are not required by every claim of the '601 Patent. (*Compare* A69, A80, at 4:26-32 *with* A86, at 15:57 – 16:2). Thus, the inventors in these lists clearly intended to identify all of the components they had in mind for the broader invention, even as they intended that not all of such components would appear in a single embodiment. (See A3129-32, at ¶¶ 44-48). These passages are therefore not limiting. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (holding that references to "the present invention" did not limit the scope of the invention when used to describe optional features).

The circumstances here are analogous to those in *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003). In that case, the preferred embodiment in the patent's specification described a stent with alternating full and half-slots,

27

but the relevant claims contained no limitation as to the particular order or type of slots contained in the stent. *Id.* at 1365. In assessing whether the specification adequately supported the claims, the Court explained that a mixture of slot types "was not conveyed as critical to the invention nor was it described as the only feasible design in the disclosure." *Id.* The language of the specification further did not "unambiguously limit" the scope of the invention to a stent with alternating slot types. *Id.* As a result, the Court concluded that "the entirety of the specification does not reflect that the invention goes to the narrower scope of a mixture of half and complete slots." *Id.*

The same is true here. As explained above, nowhere does the '601 Patent's specification convey that sensors are "critical" to the invention, nor does it describe a collating unit with sensors as the "only feasible" design or otherwise "unambiguously limit" the invention to a collating unit with sensors. To the contrary, the reason for the invention has little, if anything, to do with sensors. And the specification explicitly reveals that the invention's goal of collating and storing multiple prescription containers for specific patients can be—and is— accomplished without the use of sensors. Thus, just as in *Cordis Corp.*, the entirety of the specification simply does not reflect that the invention goes to the narrower scope of a collating unit that must include sensors. As a result, even when viewed in isolation from the original claims—though particularly when

28

viewed alongside such claims—the specification provides adequate written description support for claims that do not contain a sensor limitation. At a minimum, the specification creates genuine issues of fact that prevent the entry of summary judgment on the issue.

## D.     The District Court Overstepped Its Bounds on Summary Judgment

While this Court's review of the district court's summary judgment order is *de novo*, and the foregoing discussion details why the '601 Patent's specification provides sufficient written description support for claims without a sensor limitation, a review of the district court's analysis further emphasizes that reversal is warranted. *Cf. Nazomi Commun., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005) ("This court's review of a district court's claim construction, albeit without deference, nonetheless is not an independent analysis in the first instance."). In addition to disregarding the original claims (as already discussed), the district court was far too myopic in its understanding of the written description requirement, and it failed to apply the proper summary judgment standard. It also went out of its way to reject plainly relevant testimony from ScriptPro's expert.

### 1.     The District Court Applied Erroneous Written Description and Summary Judgment Standards

The district court apparently believed that there could be no written description support for claims that do not require sensors unless the specification specifically describes an embodiment devoid of sensors. Indeed, the district court

29

summarily dismissed the specification passages asserted by ScriptPro after merely conducting a search for the term "sensors" within those passages.

For example, the district court dismissed Figure 6 of the patent without substantive discussion because that figure is allegedly a schematic of a system that "controls operation of the . . . plurality of sensors," and thus "does not provide self-explanatory support" for claims without a sensor limitation. (A8-9). Similarly, the district court applied no analysis to the specification passages that describe how other components perform the same function as the sensors. Rather, the district court merely quoted the passages in a manner that included the term "sensor(s)," and then stated in one sentence that "the language cited by ScriptPro does not clearly describe or suggest a unit without sensors."[9] (A9).

The district court's word-search analysis is contrary to this Court's pronouncements about the nature of the written description requirement. As already explained, "it is well-settled that device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent." *Virginia Panel Corp.*, 133 F.3d at 866. Indeed, "[i]f everything in the specification were required to be read into the claims, or if structural claims were to be limited

_____

[9] The district court's treatment of the passage appearing at column 14, lines 32-39 of the '601 Patent is representative. That passage describes how the sensors are a mere "security feature," providing information that is redundant to the information already known by the control system. Rather than analyze the necessary implications of this passage, it simply quoted the passage without comment. (*See* A9).

to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). As a result, "a patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1371 (Fed. Cir. 2009); *see Cordis, Corp.*, 339 F.3d at 1364 ("The disclosure as originally filed does not, however, have to provide *in haec verba* support for the claimed subject matter at issue.").

By apparently relying on the fact that the embodiments of the '601 Patent's specification include "sensors," however, the district court's analysis was necessarily based on the mistaken belief that a patent claim *is* invalid for lack of written description if it is broader than the specific examples disclosed in the specification. The district court therefore erred in its written description analysis.

This error effectively gave the district court improper warrant to turn the summary judgment standard on its head. Indeed, because the district court believed that written description support effectively hinged upon whether the embodiments of the specification reference or describe "sensors," its finding that all of the embodiments do, in fact, reference or describe "sensors" necessarily lead it to hold that "no reasonable jury could find that the inventors were in possession of a collating unit that operated without sensors." (*See* A9, A12). In other words,

the district court's word-search analysis inherently left no room for any genuine issues of material fact regarding what the specification reasonably conveys. But because *in haec verba* support is not the standard for the written description requirement, there can be no summary judgment on the basis of the inclusion of the term "sensor(s)" in the specification's embodiments.

Relatedly, the district court's summary dismissal of the specification passages relied upon by ScriptPro on the basis that they "do[] not clearly describe or suggest a unit without sensors" placed far too strict a burden on ScriptPro, as ScriptPro did not need to establish that the specification "clearly describe[s] or suggest[s]" a collating unit without sensors to avoid summary judgment. Rather, it needed only to establish that there is a genuine issue of material fact with respect to what the specification as a whole reasonably conveys, or note that Innovation failed to meet its own high burden—both of which it did. *See* Fed. R. Civ. P. 56(a).

At a minimum, the specification passages describing other components that perform the sensors' function, the lack of any unambiguous language in the specification limiting the invention to one with sensors, and the nature of the invention itself—without even mentioning the original claims of the patent—all create issues of fact as to whether the inventors had in mind a collating unit that could operate without sensors. This is particularly true given that Innovation must

establish invalidity by the clear and convincing evidence and the facts must be viewed in the light most favorable to ScriptPro.

## 2. The District Court Erroneously Rejected Testimony from ScriptPro's Expert

Although ScriptPro submits that the disclosures of the '601 Patent's specification alone are sufficient to create genuine issues of fact concerning whether the inventors had in mind a collating unit in which sensors are optional, the district court nevertheless erred when it summarily rejected deposition and expert report testimony on this issue from ScriptPro's expert, Dr. Faddis.  Here again, the district court's analysis is indicative of its overall whitewashing of genuine issues of fact.

As already noted, when asked in his deposition "Does the written description disclose how—anywhere in the written description—does it disclose how the system would detect whether a holding area's full without using sensors?," Dr. Faddis stated, "That's obvious.  You just store memory whether it's full or not.  It's simple." (A2065, at 78:25 – 79:5).  The district court rejected this testimony as irrelevant on the basis that "[o]bviousness is not the proper test in determining whether a patent specification satisfies the written description requirement." (A10).

Ironically, while the district court elsewhere rejected portions of the specification for not being "self-explanatory" (*see* p. 30, *supra*), here it went out of

its way to avoid what is self-explanatory—that Dr. Faddis in his testimony was not referring to the legal principle of patent obviousness. Rather, Dr. Faddis used the word "obvious" simply to mean that it was "clear"—or, as Dr. Faddis himself stated, "simple"—that the specification discloses how the system would detect whether a holding area is full without using sensors. This testimony was not only responsive to counsel for Innovation's own question, but it is plainly pertinent to the written description issue. The district court therefore erred in mischaracterizing it and casting it aside as irrelevant.

The Court also rejected a similar opinion from Dr. Faddis' report because it found his opinion "conclusory" and not tied to the patent's filing date, and because his report was not sworn under penalty of perjury. (*See* A11). As to the purportedly conclusory nature of Dr. Faddis' opinion, however, Dr. Faddis cited and explained the specification passages that he believes support his opinion that one of ordinary skill in the art would understand that the inventors had a collating unit that was operable without sensors.[10] (*See* A3191-92, at ¶ 27). This Court in *Martek Biosciences Corp.* specifically held that an expert "provided more than a

---

[10] The same is true of Dr. Faddis' deposition testimony. Indeed, the very nature of counsel for Innovation's questions to Dr. Faddis required him to rely on the disclosures of the specification. (*See* A2065, at 78:25 - 79:17). Thus, Dr. Faddis' relevant deposition answers on this issue necessarily refer to and explain specific specification passages that he believes support his opinion that one of ordinary skill in the art would understand that the inventors had a collating device that was operable without sensors. This testimony is therefore not conclusory, either.

mere conclusion" on the issue of written description support when, just like Dr. Faddis, "[h]e relied on specific statements in the [patent's] application and explained how, in his opinion, a person of ordinary skill in the art would understand those statements." 579 F.3d at 1371. As for tying his opinion to the patent's filing date, the connection is plainly inherent. At a minimum, the persuasiveness of Dr. Faddis' testimony on these issues is a fact question for the jury to resolve, not the court. The court therefore erred in rejecting Dr. Faddis' expert report as conclusory and untied to the patent's filing date.

At the same time, the district court's rejection of Dr. Faddis' report as unsworn was a needlessly punitive ruling that ignored that Innovation itself did not distrust the relevant passages from the report. Indeed, Innovation did not object to ScriptPro's submission of Dr. Faddis' expert report on summary judgment, even as Innovation actively sought to strike the reports of other experts at the summary judgment stage. (*See* A1-2). Innovation's failure to object to the Faddis report constituted a waiver of any objection it might have had, and enabled the district court to properly consider it. *See Thomas v. U.S. Dept. of Energy*, 719 F.2d 342, 344 n. 3 (10th Cir. 1983); 10A Charles Alan Wright et al., Federal Practice & Procedure § 2722 (3d ed. 1998) ("[U]ncertified . . . documents may be considered by the court if not challenged. The objection must be timely or it will be deemed to have been waived."). Moreover, by raising the issue *sua sponte* in its summary

judgment order, the district court deprived ScriptPro of both notice that there was any perceived defect in its submission of Dr. Faddis' testimony and any opportunity to cure such defect. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (holding that district court erred in refusing to consider expert reports *sua sponte* in part because "[h]ad [plaintiff] been given notice that this was an issue, [it] could have obtained an affidavit easily"); *see also* Fed. R. Civ. P. 56(e)(1) (granting courts the power to give parties "an opportunity to properly support or address" a fact not supported as required by Rule 56(c)).

Perhaps more importantly, and as just explained, Dr. Faddis during his deposition testified to the very same written description opinion that appears in his report, and the district court considered his deposition testimony to be admissible. (*See* A2065, at 78:25 – 79:17; A3191-92, at ¶ 27). "[V]erification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment." *Maytag Corp. v. Electrolux Home Products, Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa Sept. 8, 2006); *see also Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1371 (D. Kan. Jan. 26, 1996) ("For plaintiffs to rely on [the expert's] opinions, they could have, and should have, set them out in an affidavit or cited to portions of [the expert's] deposition."). This makes logical sense, because "where the expert has been deposed, and in the course of such deposition, has reaffirmed opinions stated

in the unsworn report, the parties have had a full and fair opportunity to address the basis and admissibility of the expert's opinions as summarized in the unsworn report." *Maytag*, 448 F. Supp. 2d at 1064-65.

This reasoning is particularly strong here, because Innovation not only had the opportunity to explore Dr. Faddis' written description opinion via deposition, but it also voluntarily submitted his relevant deposition answers in support of its ***own*** motion for summary judgment. (A2063; A2065, at 78:25 – 79:5). By not objecting to the submission of Dr. Faddis' report and affirmatively submitting his deposition testimony to the district court, Innovation assented to the admissibility of all of his opinions on this issue, whether in his deposition or in his report. Given these facts, the district court's rejection of Dr. Faddis' report as unsworn is merely another example of how the district court went out of its way to enter summary judgment—and erred in the process.[11]

## CONCLUSION AND STATEMENT OF RELIEF

Innovation bore a heavy burden to invalidate the asserted claims of the '601 Patent. Not only that, but it is particularly rare for a court to invalidate claims for lack of written description support where, as here, the asserted claims have ***never*** changed vis-à-vis the relevant limitations, and further are not genus claims,

---

[11] ScriptPro submits that the district court's refusal to consider Dr. Faddis's report was error regardless of whether a *de novo* or an abuse of discretion standard applies to the court's handling of the report.

chemical claims, or claims directed to an otherwise rapidly changing technology. Add to these facts the specification's plain indication that sensors are not critical to or required for the claimed invention, and it is clear that a finding of invalidity is not warranted, particularly not at the summary judgment stage.

As such, ScriptPro respectfully requests that the Court find that Innovation is not entitled to summary judgment on the issue of written description support, reverse the district court's summary judgment order accordingly, and remand the action to the district court for further proceedings on ScriptPro's infringement claims.

Respectfully Submitted,

Dated: November 7, 2013

LATHROP & GAGE LLP

/s/ A. Justin Poplin
A. Justin Poplin – Principal Counsel
R. Scott Beeler
Jennifer M. Hannah
10851 Mastin Blvd Bldg 82, Ste 1000
Overland Park, KS 66210-1669
Phone: (913) 451-5100
Fax: (913) 451-0875
Email: jpoplin@lathropgage.com
        sbeeler@lathropgage.com
        jhannah@lathropgage.com

Travis W. McCallon
2345 Grand Blvd, Ste 2400
Kansas City, MO 64108-2684
Phone: (816) 292-2000
Fax: (816) 292-2001
Email: tmccallon@lathropgage.com

Attorneys for Plaintiffs-Appellants

CASE PARTICIPANTS ONLY Case: 13-1561 Document: 30 Page: 47 Filed: 11/07/2013

# ADDENDUM

Case: 13-1561 Case: SB-PARTICIPANTS ONLY Document: 30 Filed: 11/07/2013 Page: 48 Document: 30 Page: 48 Filed: 11/07/2013

Case 2:06-cv-02468-CM   Document 312   Filed 06/26/12   Page 1 of 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SCRIPTPRO LLC, et al.,         )
                                          )
              Plaintiffs,      )
                                          )
v.                                        )
                                        )       No. 06-2468-CM
                                        )
INNOVATION ASSOCIATES, INC.,     )
                                        )
              Defendant.      )
_____)

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs ScriptPro, LLC, and ScriptPro USA, Inc. (collectively "ScriptPro") bring this action alleging that defendant Innovation Associates, Inc. ("Innovation"), infringes on ScriptPro's patent. (Doc. 89.)  Innovation counterclaims for a declaratory judgment of invalidity, noninfringement and/or unenforceability as to the patent, and also alleges tortious interference with prospective and existing business relations and unfair trade practices.  (Doc. 113.)  In an Order dated April 26, 2011, the court construed a number of terms that the parties believed to be in issue.  (Doc. 146.)  Now before the court are the following motions:

- Plaintiff's Motion to Strike the Rebuttal Expert Designation by Innovation Associates, Inc. of Jason A. Janet (Doc. 245);

- Defendant Innovation Associates, Inc.'s Motion to Limit Testimony and for Attorney's Fees (Doc. 254);

- Defendant Innovation Associates, Inc.'s Motion to Exclude Shawn Fox's Testimony on Patent Infringement Damages (Doc. 282); and

A1

- The parties' cross-motions for summary judgment (defendant's motion, Doc. 271; plaintiff's motion, Doc. 274).

- The parties' Joint Motion for Special Trial Setting (Doc. 308)

- Defendant Innovation Associates, Inc.'s Motion for Extension of Time to File Summary Judgment Motion on the Issue of Willfulness (Doc. 309) and Motion (Doc. 310).

The court rules on the motions in the following manner.

## I.    General Factual and Procedural Background[1]

As set out in the court's previous order, both ScriptPro and Innovation sell robots that automatically fill prescriptions for pharmacies (Automatic Dispensing Systems, or ADSs).

ScriptPro holds a patent for and sells a "collating unit" that attaches to an ADS and sorts output into holding areas grouped by patient or other identifying information.  Patent No. 6,910,601 ("the '601 patent"), entitled "Collating Unit for Use With a Control Center Cooperating With an Automatic Prescription or Pharmaceutical Dispensing System," was issued on June 28, 2005, to ScriptPro.  ScriptPro asserts that Innovation's robot, ROBOTx, infringes on its patent; specifically, on claims 1, 2, 4, and 8.

Shortly after ScriptPro filed this lawsuit, Innovation initiated Inter Partes Reexamination No. 95/000,292 with respect to the '601 patent, and the case was stayed from May 2007 until July 2010.  An Inter Partes Reexamination Certificate was issued with respect to the '601 patent on January 4,

---

[1]  The court construes the facts in the light most favorable to the nonmoving party pursuant to Fed. R. Civ. P. 56.  The court reviewed the facts proposed by both parties, and included only those that are relevant, material, and properly supported by the record.  The court includes specific facts as necessary in its discussion of the arguments.

2011.

Through reexamination, claim 4 was rewritten in independent form but was not amended substantively. Independent claims 1 and 2 were substantively amended.

## II.    Standards

A patent infringement analysis involves two steps: (1) construing the meaning and scope of the claims and (2) comparing the construed claims to the device accused of infringing. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The court issued a claim construction order on April 26, 2011. (Doc. 146.) This matter is currently before the court on cross-motions for summary judgment.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id*. at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary

-3-

A3

judgment).  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (internal citations and quotations omitted).  The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations.  *Anderson*, 477 U.S. at 256.

The filing of cross-motions for summary judgment does not change the standard of review. *James Barlow Family Ltd. P'ship v. David M. Munson Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) ("Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.").

## III.   Defendant Innovation's Motion

Defendant seeks summary judgment as to the following issues:

- Innovation is not estopped from pursuing invalidity

   (a) pursuant to 35 U.S.C. § 112 for lack of written description and enablement, and that the claims are invalid for lack of written description;

   (b) that the asserted claims are invalid as anticipated and/or obvious in light of the SI/Baker High Volume Fill System, and

- Innovation is entitled to absolute intervening rights on claims 1 and 2, barring ScriptPro from recovering infringement damages on those claims prior to January 4, 2011;

- correcting two minor typographical errors in reexamined claim 4;

- non-infringement on claims 4 and 8, as well as non-infringement under the doctrine of

equivalents; and

• ScriptPro's damage claim in its entirety.

The court ultimately grants summary judgment in favor of Innovation and against ScriptPro

on the subject of invalidity, based on its determination that Innovation is not estopped from pursuing

invalidity pursuant to § 112, and that the claims fail to satisfy the written-description requirement.  In

light of this ruling, the court does not address the remainder of Innovation's arguments.

**A.    Estoppel on § 112 Challenges**

The parties stipulate that Innovation is not estopped by 35 U.S.C. § 315(c) from asserting that

claims 4 and 8 are invalid for failing to comply with the written description and enablement

requirements of 35 U.S.C. § 112.  (Doc. 279 at 4.)  However, ScriptPro contests Innovation's ability

to challenge the validity of claims 1 and 2 for alleged lack of written description and enablement.

ScriptPro argues that Innovation was free to—and did— raise § 112 challenges during reexamination

and, having had that opportunity, is estopped by § 315(c) from raising them now.

The applicable standard is not disputed: the Patent Act provides that a third party such as

Innovation, who requests inter partes reexamination "is estopped from asserting at a later time, in

any civil action . . . the invalidity of any claim finally determined to be valid and patentable on any

ground which the third-party requester raised or could have raised during the inter partes

reexamination proceedings." 35 U.S.C. § 315(c).  The court must determine whether, as a matter of

law, Innovation is precluded from asserting invalidity as to claims 1 and 2 based on lack of written

description and enablement.

There is no dispute that claims 1 and 2 were substantively amended during reexamination to

overcome prior art.  There is also no dispute that the amendments did not delete from original claims

1 and 2 any claim limitation requiring a plurality of sensors.[2]  Innovation notes that a third party can request inter partes reexamination only "on the basis of any prior art cited under the provisions of section 301."  *Id.* § 311.  And "other matters, such as public use or sale, . . . 35 U.S.C. 112 . . . will not be considered when making the determination on the request and should not be presented in the request."  MPEP § 2617.  The Patent and Trademark Office ("PTO") only examines § 112 requirements as to claim language added during reexamination that is different from original claim language and any language deleted from a claim during reexamination.  MPEP § 2258 (37 C.F.R. § 1.552) (noting that "a claim which is amended or a new claim which is presented containing a limitation not found in the original patent claim should be considered for compliance under 35 U.S.C. 112 only with respect to that limitation").  In other words, Innovation could not have raised § 112 claims based on the lack of a limitation requiring sensors because the reexamination did not encompass this language (or lack thereof).

The Patent Act is clear about what can be raised in reexamination.  And based on the summary judgment record, this § 112 argument could not have been raised.  Innovation is therefore not estopped from raising it now.  The court turns to address Innovation's argument that it is entitled to summary judgment that the claims lack written description.

**B.**　　**Invalid for Lack of Written Description**

The written-description requirement is contained in Section 112 of the Patent Act.  The first paragraph of that section provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is

---

[2]  No party suggests that the sensorless language of the claims as originally filed can alone satisfy the written description requirement.

-6-

A6

most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. A patent claim is therefore invalid unless the disclosure in the specification "clearly allow[s] a person of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (internal quotation marks omitted). The written description "must convey with reasonable clarity . . . that, as of the filing date sought, [the patentee] was in possession of the invention." *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (internal quotation marks omitted). Determining whether the written-description requirement is met requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. *Ariad*, 598 F.3d at 1351. To succeed on an invalidity claim, the accused must show by clear and convincing evidence that the claims lack written description. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011); *Ariad*, 599 F.3d at 1354.

The sufficiency of a patent's written description is ordinarily a question of fact, but "[a] patent also can be held invalid [as a matter of law] for failure to meet the written description requirement based solely on the face of the patent specification." *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347 (Fed. Cir. 2011); *see also Ariad*, 598 F.3d at 1355 (holding that a determination that a patent is invalid for failure to meet the written description requirement is a question of fact).

Innovation argues that the asserted claims are invalid under § 112 for lack of written description because, although the specification indicates that the inventors were in possession of an invention that automatically stores containers by utilizing sensors, claims 1, 2, 4, and 8 (original and reexamined) broadly cover a collating unit with or without sensors. (Doc. 275 at 40.) In support,

-7-

Innovation relies on the '601 patent itself, and the report of its expert, Dr. Jason Janet. Particularly, Innovation notes that the specification repeatedly describes the "present invention" as a collating unit with sensors; a portion of the specification describes the integral role sensors play in storing containers in the holding area; and the described embodiments include a plurality of sensors. The summary of the invention uses mandatory language when describing the existence and role of sensors, but employs optional/preferable language when describing other components. (Doc. 290-5 at 23.) In his report, Dr. Janet states "I cannot even identify a contemplation in the '601 specification of a collating unit for automatically storing prescription containers that does not employ sensors." (Doc. 290-5 at 27.) He goes on to opine that

> [t]he specification of the '601 patent conveys to one of ordinary skill in the art that the patentees invented a collating unit for automatically storing prescription containers that employs sensors. . . . As such, it is my opinion that after reading the specification of the '601 patent, one of ordinary skill in the art would not understand the patentees to have invented a collating unit that automatically stored prescription containers without the use of sensors. . . . Because claims 1, 2, 4, and 8 are broader than the invention disclosed in the specification in that they do not require sensors, it is my opinion that there is no written description for these claims.

(Doc. 290-5 at 28.)

ScriptPro, on the other hand, asserts that sensors are not necessarily present or required, and that there are other structures disclosed in the specification that could make the determination of whether an object is stored in the collating unit.[3] ScriptPro asserts that alternative structures for performing these functions include a database inside memory, an input device, and/or an indicia reader. ScriptPro points to Fig. 6 of the '601 patent for support. (*See* Doc. 273-1 at 9.) But Fig. 6 does not provide self-explanatory support for ScriptPro's position: It is a schematic of the

---

[3] ScriptPro does not suggest that the sensorless language of the claims as originally filed can, alone, satisfy the written description requirement. See, e.g., Enzo Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956, 968–69 (Fed. Cir. 2002).

A8

components of a control system which, according to the written description, "controls operation of the . . . plurality of sensors . . . [and] includes a computing device, . . . a sensor controller for each sensor, [and] a central sensor controller." (Doc. 273-1 at 14, col. 5, ll. 1–7.)

ScriptPro maintains that there is disclosure in the '601 patent specification of a collating unit that does not require sensors. (Doc. 291 at 5 (citing the '601 patent, Doc. 273-1, at col. 5, ll. 64–67; col. 12, ll. 6–11 & 28–30; col. 14, ll. 32–39).) But a review of the language cited by ScriptPro does not clearly describe or suggest a unit without sensors. Column 5, lines 64–67 state: "Based on the speed of the infeed conveyor and the sensor sensing the presence of the container, the control system knows when the container is positioned at the opening of the holding area." Column 12, lines 6–11 states: "If the sensors 26 determine that an object is located in the collating unit 10, such information is transmitted to the control system 28 via the central sensor controller 102, and the control system 28 instructs an error message to be displayed on the display 108, as depicted in Box 7B." Lines 28–30 state: "The sensor 26 positioned at the open end 80 of the holding area 22 is then instructed to confirm that the container is located at the open end 80 of the holding area." Column 14, lines 32–39 states: "As a security feature, after retrieval of the containers from the holding area 22, the sensors 26 positioned at the open and closed ends 80, 82 of the holding area 22, determine if any container is located in the area 22. If a container is located in the holding area 22, the control system 28 instructs an error message to be displayed on the display 108."

ScriptPro argues that claims 1, 2, 4, and 8 are directed at storing, and although sensors may be relevant to the features in claims 1, 2, 4, and 8, sensors are not necessary for storing. Sensors are, however, claimed in claims 7, 9, 13, 20, and 21. ScriptPro suggests that this illustrates that the inventors did not simply overlook sensors, but purposefully omitted them from claims 1, 2, 4, and 8. Whether the omission was purposeful or inadvertent is immaterial.

Each party is prepared to offer expert testimony in support of its argument. According to Dr. Janet's sworn declaration, the claims of the '601 patent are invalid for failing to satisfy the written description requirement. (Doc. 273-4 at 2; Doc. 290-5 at 6–7.) His initial expert report supports this opinion, and suggests, based on his review of the '601 patent and the court's claim construction order, that as of the filing date, the patent specification fails to convey with reasonable clarity to one of ordinary skill in the art that the inventor was in possession of the claimed invention. (Doc. 290-5 at 20–28.)

ScriptPro's expert, Terry Faddis, opined in his report that:

> it is clear from the written description of the '601 Patent that sensors are not required to practice the claimed invention. For example the control system for the collating unit could simply keep track, in memory, what storage locations are available and simply route the appropriate prescriptions to these locations. Figure 6 shows the input device 104, the indicia reader 106, the sensor controller 100 and the central sensor controller 102 providing input to the computing device 92. In column 12, lines 6–17 and lines 28–36 the sensors are used to provide error and confirmation indications for the collating unit. Based on the above, one of ordinary skill in the art would understand that the inventors had a collating device that was operable without sensors, but could use sensors to confirm operating status.

(Doc. 291-1 at 5–6.)

When asked by opposing counsel in his deposition "Does the written description disclose how—anywhere in the written description—does it disclose how the system would detect whether a holding area's full without using sensors?," Dr. Faddis answered, "That's obvious. You just store memory whether its's full or not. It's simple." (Doc. 291-7 at 3.)

Obviousness is not the proper test in determining whether a patent specification satisfies the written description requirement. *See Ariad*, 598 F.3d at 1352 (citing *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997)). The test is whether, as of the filing date, the patent specification conveys with reasonable clarity to one of ordinary skill in the art that the inventor was

-10-

A10

in possession of the claimed invention.

Dr. Faddis' 11-page report disagreeing with Janet's opinion on invalidity is not sworn under penalty of perjury and is not accompanied by any sworn affidavit or declaration. *See Winstead v. Georgia Gulf Corp.*, 77 F. App'x 267 (5th Cir. 2003) (holding that preliminary expert reports were not competent summary judgment evidence where reports were neither sworn nor verified); *Sigler v. Amer. Honda Motor Co.*, 532 F.3d 469, 480–81 (6th Cir. 2008) (holding that the district court improperly considered three unsworn expert reports when ruling on a motion for summary judgment); *see also* 12 James Wm. Moore *et al.*, Moore's Federal Practice, p. 60.42(6), n.11 (3d ed. 1997) (stating that "unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment.").

Even if the court considers his report as evidence for purposes of Rule 56, his opinions therein—as in his deposition testimony—are entirely conclusory and only offer an opinion on the ultimate legal issue that is not helpful to the jury. *See Dynacore Hldgs. Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (stating "[i]t is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact").

Additionally, Dr. Faddis fails to tie his conclusory opinion—that one skilled in the art would understand that the device described could operate without sensors—to the critical time-frame: the date of filing. *See, e.g., Ariad*, 598 F.3d at 1355 (holding that, "[b]ecause written description is determined as of the filing date—April 21, 1989, in this case—evidence of what one of ordinary skill in the art knew in 1990 or 1991 cannot provide substantial evidence to the jury that the asserted

-11-

A11

claims were supported by adequate written description.").

ScriptPro does not bear the burden of proof on the assertion of invalidity. Indeed, that burden is Innovation's, and must be met by clear and convincing evidence because the patent is presumed to be valid. However, ScriptPro does bear the burden on summary judgment to set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. After a thorough review of the record, the court concludes that ScriptPro fails to meet this burden as to written description. Based on the record before it, the court concludes that no reasonable jury could find that the inventors were in possession of a collating unit that operated without sensors. Innovation is therefore entitled to summary judgment on its claim of invalidity as to all challenged claims.

## IV.  Plaintiff ScriptPro's Motion

ScriptPro seeks summary judgment:

- in its favor on its claims against Innovation for patent infringement; and

- in its favor and against Innovation on Innovation's counterclaims for tortious interference.

Because the court grants summary judgment for Innovation and against ScriptPro as to invalidity of the four asserted claims, the first portion of ScriptPro's motion is denied as moot. The court also denies the second portion of the motion based on its conclusion that ScriptPro is not entitled to summary judgment on Innovation's tortious interference claims.

### A.  Tortious Interference Claims

Innovation argues that these claims are governed by New York law, but ScriptPro asserts that Kansas law applies. For purposes of this motion at least, ScriptPro admits that there are no material differences between Kansas and New York law, and thus ScriptPro makes its summary judgment

-12-

A12

arguments in the context of New York law, which Innovation argues is applicable.   (Doc. 280 at 50 n.4.)  Based on ScriptPro's position, the court will apply New York law.

While New York law recognizes two related torts— interference with prospective and existing contracts—greater protection is accorded an interest in an existing contract than to the less substantive, more speculative interest in a prospective relationship.  *See, e.g.*, *White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 867 N.E.2d 381 (N.Y. 2007).  For example, for interference with contract, wrongful means need not be proved, but for interference with prospective advantage, wrongful means are required.  *See NBT Bancorp Inc. v Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492 (N.Y. 1996).

<u>Tortious Interference with Contract</u>

To establish tortious interference with contract, Innovation must prove: (1) the existence of a contract, enforceable by Innovation; (2) ScriptPro's knowledge of the existence of that contract; (3) the intentional procurement by ScriptPro of the breach of the contract without justification; and (4) the breach resulted in damages to Innovation.[4]  *See Ferrandino & Son, Inc., v. Wheaton Bldrs., Inc.*, LLC, 82 A.D.3d 1035, 1036 (N.Y. App. 2011); N.Y. Pattern Jury Instr. 3:56.

ScriptPro argues it is entitled to summary judgment on the claim because Innovation cannot produce evidence in support of the second, third, or fourth elements.  (Doc. 280 at 50.)

To satisfy the second element, Innovation must establish that ScriptPro had actual knowledge of Innovation's contracts.  *State Enterpr. Inc. v. Southridge Coop. Section 1, Inc.*, 18 A.D.2d 226, 227–28 (N.Y. App. 1963).  Knowledge is generally a question for the jury.  *Id*.  Here, ScriptPro

---

[4]  New York courts disagree as to whether defendant's actions must be the "but-for" cause of the breach, or merely a "substantial factor" for the breach.  Compare *Ferrandino & Son, Inc. v. Wheaton Bldrs., Inc., LLC*, 82 A.D.3d at 1036, to *Andrew Greenberg Inc. v. Sir-Tech Software, Inc.*, 245 A.D.2d 1004, 1005 (N.Y. App. 1997).

-13-

argues that Innovation fails to demonstrate a genuine issue of fact regarding this element. Although there is evidence that ScriptPro representatives contacted individuals associated with certain of Innovation's clients attempting to dissuade them from doing business with Innovation, there is no allegation that ScriptPro knew that Innovation had contracts with these individuals/companies. However, Innovation is entitled to all reasonable inferences flowing from the facts. And Innovation argues that ScriptPro's knowledge can be inferred from the temporal proximity of ScriptPro's conduct in relation to the deals at issue. The court agrees. The evidence suggests that a number of deals were on the verge of being closed when ScriptPro representatives stepped in, and the deals fell through shortly thereafter.

ScriptPro also argues that Innovation can produce no admissible evidence as to why customers terminated their contracts with Innovation. Innovation acknowledges that its evidence is largely based on the testimony of Doyle Jensen, Innovation's Vice-President of Global Business Development, and Mary Reno, Innovation's Chief Executive Officer. The parties dispute the admissibility of this testimony. Innovation did not depose any of the clients, but it did disclose them as potential trial witnesses, and asserts that it can and will call them depending on the court's evidentiary rulings. On review, the record contains emails from which a reasonable jury could infer that certain customers may have terminated their contracts and/or relationships with Innovation based on representations from ScriptPro.[5] And it appears there may be admissible evidence supporting the causation element. Of course, to succeed at trial, Innovation must be able to present

---

[5] *See, e.g.,* Exs. D-4 and D-5 (Docs. 290-11; 290-12) regarding Lovelace; Ex. E-14 (Doc. 290-37) regarding Pharmasave; Exs. D-9 (Doc. 290-16) and E-4 (Doc. 290-27) regarding JPS Health; (Exs. D-6, D-7, D-8 (Docs. 290-13, 14 and 15) and E-3 (Doc. 290-26) regarding AmMed; Ex. E-1 (Doc. 290-24) regarding Safeway; Ex. D-15 (Doc. 290-22) regarding Tim's Pharmacy; and Ex. D-13 (290-20) regarding Daugherty's.

Case: 13-1561 Case: 13-1561 CASE PARTICIPANTS ONLY Document: 62-30 Document: 64 Page: 30 Filed: 11/07/2013 Page: 62 Filed: 11/07/2013

Case 2:06-cv-02468-CM Document 312 Filed 06/26/12 Page 15 of 21

facts and inferences supporting each of the elements as to each (or at least one) particular customer. This is a close call. But upon review of the record, the court believes that Innovation just survives summary judgment on its claim.

<u>Tortious Interference with Business Relationships/Prospective Economic Advantage</u>

To establish tortious interference with business relationships, Innovation must prove: (1) a prospective business relationship with a third party; (2) defendant knew about the prospective relationship; (3) defendant intentionally interfered with that relationship; (3) for the sole purpose of harming the plaintiff or by wrongful means;[6] and (4) this caused injury to the plaintiff. *N. State Autobahn, Inc. v. Progressive Ins. Grp.*, 928 N.Y.S.2d 199, 205–06 (N.Y. App. 2011); *see also* N.Y. Pattern Jury Instr. 3:57.

ScriptPro focuses on the third and fourth elements, arguing that there is no evidence of "wrongful" conduct, nor is there evidence that ScriptPro's conduct caused Innovation any damages. Whether conduct is "wrongful" is a question of law for the court. As a general rule, a defendant's conduct must amount to a crime or an independent tort. *See, e.g., Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). Examples of the types of culpable conduct that would suffice include physical violence, fraud or misrepresentation, or malicious prosecution. *See id.* (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980), and Restatement (Second) of Torts § 768). Civil suits and threats thereof constitute wrongful means only if such tactics are frivolous, which is not the case here. *See Pagliaccio v. Holborn Corp.*, 289 A.D. 2d 85 (N.Y. App. 2001). Competitive marketing and persuasion alone do not rise to the level of

---

[6] Only the "wrongful" element is implicated here, as opposed to the "sole purpose" element. A party does not act for the sole purpose of harming another when it has another reason, such as promoting its own business. Here, ScriptPro indisputably had an economic self-interest motivating its conduct. *See Carvel*, 818 N.E.2d at 1103.

wrongful or culpable means. *See Guard-Life*, 406 N.E.2d at 449.

Based on this court's review of the case law, whether a "misrepresentation" constitutes the kind of culpable conduct required to satisfy the "wrongful" requirement may be a matter of degree. For instance, a former employer did not engage in wrongful conduct, as required to support former employee's tortious interference claim, where former employer sent a letter to former employee's current employer alleging that the employee was in violation of covenants not to compete, where the employee was indeed in violation of such covenants. *Smith v. Meridian Techs., Inc.*, 86 A.D.3d 557, 559–60 (N.Y. App. 2011). However, where plaintiff automobile repair shop submitted evidence that a number of potential customers were convinced by defendant insurer to use its shops instead of plaintiff's shop by economic coercion and misrepresentations concerning plaintiff's shop, and by defendant insurer's commencement of an unsuccessful lawsuit against plaintiff, such evidence was sufficient to raise a question of fact for trial with respect to the identified lost customers. *N. State Autobahn, Inc. v. Progressive Ins. Grp.*, 928 N.Y.S.2d 199, 206–07 (N.Y. App. 2011); *see also Stork H & E Turbo Blading, Inc. v. Berry*, No. 2011-0373, 2011 WL 2611642, at *4 (N.Y. App. June 30, 2011 ) (plaintiff not entitled to injunctive relief on its tortious interference claim where there was "a sharply-disputed issue of fact with respect to the truth of the defendant's alleged statements"); *c.f. Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. Apr. 8, 2009 ) (noting "the New York Court of Appeals has never held that any misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations.").

In response to ScriptPro's arguments, Innovation offers the testimony of its vice-president, Mr. Jensen, that as to certain of its customers or prospective customers, ScriptPro representatives made false and misleading statements such as telling customers that Innovation was losing or had

-16-

already lost this patent infringement lawsuit; and/or that their pharmacy or company would face

liability if they purchased from Innovation.  In support of Mr. Jensen's testimony, Innovation offers

documentary evidence in the form of emails from current and potential customers.

For instance, on September 21, 2010, Randall Ward from Tim's Pharmacy sent Innovation an

email from "Tim" containing the following:

> I was wondering if you could enlighten me on something. I have had ScriptPro
> knocking at my door lately. I have no intention of making such a move. But what
> bothers me is their tactics. They are slandering your company by saying they have a
> pending law suit against IA for impinging [*sic*] on one of their patents. They say if it
> goes through it may jeopardize our pharmacy. They are also using this same tactic on
> customers of yours that are debating on whether to go with your robotics or switch to
> theirs. They are very adamant and bold about this accusation. I talked to Mark at your
> office and he says that there is no validity to their accusations, I really don't care if
> they have a lawsuit or not. Even if there is a pending lawsuit they are unwise and
> unethical to be using it at this point when there has been no settlement in the case.
> They even said that IA has offered them a settlement of some kind but they would not
> take it. I thought you might want to know about this.

(Doc. 290-22 at 2.)

Also, in an email from Barry Peachment at Canada Safeway dated November 1, 2010, Mr.

Peachment copied a portion of an email he had received from a ScriptPro representative which

stated:

> CVS de-installed their counting technology cabinets from 641 of their stores .... 2
> years into a 5 year contract. The Innovation cells would break all the time and the
> stores found that it was easier to count than use their technology, Their robots use the
> exact same cells as their counting cabinets. More important, however, is that there is a
> pending lawsuit against Innovation Associates for patent infringement.

(Doc. 290-24 at 2.)

Julie Abernathy, at JPS Health Network, sent the following email to Innovation on November

30, 2009:

> I received an email from someone at ScriptPro. Can you explain below? Thanks.

A17

> You probably do not want to hear about the Patent Infringement
> Litigation between ScriptPro and Innovation, but it is a matter of
> public knowledge.
> This has been ongoing quite some time and Innovation has tried to get
> the courts to dismiss this action twice now, both unsuccessful.  Our
> attorney is 99% sure that our claim will be upheld by the courts. This
> of course means that Innovation would have to quit selling, marketing,
> promoting and servicing their robot. It would also mean that anyone
> who purchased this product would be required by law to discontinue
> the use of this robot.  I can send you documentation to share with your
> corporate lawyers if you like.

(Doc. 290-27 at 2.)

Joe Dickson at Pharmasave received this email dated November 25, 2009, from a ScriptPro

representative, which he forwarded to Innovation:

> There are significant differences between ScriptPro robots and those of our
> competitors, including Innovation Associates.  I have attached a side-by-side
> comparison here. The dispensing cells used in IA's robots are the same as those from
> their counting technology cabinets. CVS, the largest chain in the US, de-installed
> these counting cabinets in 641 of their stores, 3 years into a 5 year contract, because
> they were so unhappy with the technology. They replaced them with ScriptPro
> robots, and we continue to install with CVS.
> There is also some legal information about which you should be aware regarding
> Innovation Associates and their robotic system. I am forwarding to you an email with
> 6 attachments from ScriptPro's President and CEO, Mike Coughlin, regarding
> ongoing litigation with Innovation Associates.  ScriptPro claimed that IA's robotic
> system infringed upon our patents, and from there they asked us to prove the validity
> of our patents. ScriptPro has prevailed in their third and final
> appeal with respect to the validity of the patents, so now we are waiting for a
> judgment in the case.
> > From: Mike Coughlin
> > Sent: Tuesday, March 03, 2009 8:01 PM
> > To: ScriptPro Department Managers; ScriptPro Sales & Marketing
> > Subject: IA Patent Infringement Litigation
> > Attached are the most current, pertinent public documents pertaining to
> > ScriptPro's patent infringement litigation against Innovation
> > Associates, Inc. These are highly technical documents, so I am not
> > encouraging you to read them or try to understand them without
> > competent legal advice.
> > Some of you have customers or prospects whose legal advisors have
> > inquired regarding the status of this litigation.  I am sending these

> documents to you with permission to forward them on to such parties
> who may have a need to know in order to comply with their own
> obligations to not infringe patents as purchasers or users of infringing
> technologies.
> Thanks, Mike
>
> Choosing the right automation is critical for your pharmacy, and I urge you to truly
> evaluate whether IA is presenting you with "a good deal" in light of this information.

(Doc. 290-37 at 4.)

Finally, Brad Trom at Lovelace forwarded the following email to Innovation, which was one

of several he received from Mike Coughlin at ScriptPro, and which is dated December 3, 2009:

> Attached is ScriptPro's response to IA's latest attempt to delay the patent lawsuit. I
> don't think you will want to read the entire document. but the first page tells the story
> when it says:
>> "The Appellant's Appeal Brief is so deficient (both procedurally and
>> substantively, as addressed below), that Respondent respectfully
>> suggests the USPTO should consider whether it is an intentional
>> failure under MPEP 2675 to address the examiner's findings, or
>> whether it is merely an attempt to further extend this proceeding and
>> the related litigation which is being stayed-amounting to an
>> impermissible litigation tactic under MPEP 2609.  Any relief that the
>> USPTO can provide to expedite this reexamination proceeding is
>> respectfully requested."
> The IA attorneys are grasping at straws to try to come up with new defenses since
> their previous defenses have been rejected.  As pointed out by our attorneys, IA is
> appealing the decisions that have been made, and they can't start over with new
> defenses in an appellate process. They have dragged this on for years with these delay
> tactics. If you have customers who want an update on the status of this suit, you can
> send this to them.  I think we are coming down the home stretch on getting justice on
> this patent violation.  IA continues to sell the product.  This runs up the potential
> liability of IA and their customers who are using the system in violation of ScriptPro's
> patent.
> Mike

(Doc. 290-11 at 2–3.)

The court finds that Innovation has come forward with evidence sufficient to create a triable

issue of fact concerning whether ScriptPro's conduct was wrongful as required by applicable law.

The court therefore denies summary judgment to ScriptPro as to this claim.

-19-

A19

**V.**     **Plaintiff's Motion to Strike the Rebuttal Expert Designation by Innovation Associates, Inc. of Jason A. Janet (Doc. 245); Defendant Innovation Associates Inc.'s Motion to Limit Testimony and for Attorney's Fees (Doc. 254); Innovation Associates Inc.'s Motion to Exclude Shawn Fox's Testimony on Patent Infringement Damages (Doc. 282); the parties' Joint Motion for Special Trial Setting (Doc. 308); Defendant Innovation Associates, Inc.'s Motion for Extension of Time to File Summary Judgment Motion on the Issue of Willfulness (Doc. 309); and Defendant's Motion for Summary Judgment on the Issue of Willfulness (Doc. 310)**

In light of the rulings in this Memorandum and Order, the court declines to address the arguments contained in these motions, and instead denies them as moot. However, because Innovation's state law claims remain, the parties' Joint Motion for Special Trial Setting (Doc. 308) remains pending.

**IT IS THEREFORE ORDERED** that Defendant Innovation Associates Inc.'s Motion for Summary Judgment (Doc. 271) is granted as set forth above.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 274) is denied.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike the Rebuttal Expert Designation by Innovation Associates, Inc. of Jason A. Janet (Doc. 245) is denied as moot.

**IT IS FURTHER ORDERED** that Defendant Innovation Associates Inc.'s Motion to Limit Testimony and for Attorney's Fees (Doc. 254) is denied as moot.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Shawn Fox's Testimony on Patent Infringement Damages (Doc. 282) is denied as moot.

-20-

**IT IS FURTHER ORDERED** that the parties' Joint Motion for Special Trial Setting (Doc. 308) remains pending.

**IT IS FURTHER ORDERED** that Defendant Innovation Associates, Inc.'s Motion for Extension of Time to File Summary Judgment Motion on the Issue of Willfulness (Doc. 309) and Motion (Doc. 310) are denied as moot.

Dated this 26th day of June 2012, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**

A21



US006910601B2

(12) **United States Patent**
　　 Thomas et al.

(10) Patent No.: **US 6,910,601 B2**
(45) Date of Patent: **Jun. 28, 2005**

(54) **COLLATING UNIT FOR USE WITH A CONTROL CENTER COOPERATING WITH AN AUTOMATIC PRESCRIPTION OR PHARMACEUTICAL DISPENSING SYSTEM**

(75) Inventors: **Tracy I. Thomas**, Overland Park, KS (US); **Michael E. Coughlin**, Mission Hills, KS (US)

(73) Assignee: **ScriptPro LLC**, Mission, KS (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 177 days.

(21) Appl. No.: **10/615,503**

(22) Filed: **Jul. 8, 2003**

(65) **Prior Publication Data**

US 2004/0039482 A1 Feb. 26, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/394,589, filed on Jul. 8, 2002.

(51) Int. Cl.$^7$ .............................................. **B65G 59/00**
(52) U.S. Cl. ........................................ **221/119; 700/244**
(58) Field of Search ................................ 221/119, 123, 221/253; 700/244

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 341,045 A | 11/1886 | Igel et al. |
| 1,128,561 A | 2/1915 | Webendorfer |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 99676775 | 5/1997 |
| DE | 4235047 | 4/1994 |
| EP | 282785 A | 9/1988 |
| EP | 0471530 | 12/1991 |
| EP | 0827733 | 8/1997 |
| EP | 0924676 | 10/1998 |
| FR | 1449591 | 8/1966 |
| GP | 2109137 | 5/1983 |
| JP | 53145260 | 12/1978 |
| JP | 0043743 | 3/1984 |
| JP | 3031965 | 2/1991 |
| JP | 3240602 | 10/1991 |

(Continued)

OTHER PUBLICATIONS

Guerra, Lawrence E.; U.S. Appl. No. 10/896,477; filed Jul. 22, 2004; Fork Based Transport Storage System for Pharmaceutical Unit.

(Continued)

*Primary Examiner*—Kenneth Noland
(74) *Attorney, Agent, or Firm*—Hovey Williams LLP

(57) **ABSTRACT**

A collating unit (**10**) for use with a control center (**12**) cooperating with an automatic dispensing system ("ADS") (**14**) for automatic storage of prescription containers dispensed from the ADS (**14**). The collating unit (**10**) broadly comprises an infeed conveyor (**16**) for transporting the prescription containers from the ADS (**14**) to the collating unit (**10**); a base (**18**) housed within the control center (**12**) and positioned generally adjacent to the infeed conveyor (**16**); a collating unit conveyor (**20**) mounted on the base (**18**); a frame (**21**) substantially surrounding and covering the infeed conveyor (**16**) and the base (**18**); a plurality of holding areas (**22**) formed within the frame (**21**); a plurality of guide arms (**24**) mounted on the base (**18**) between the infeed conveyor (**16**) and the collating unit conveyor (**20**) and operable to maneuver the containers from the infeed conveyor (**16**) into the plurality of holding areas (**22**); a plurality of sensors (**26**) to sense the presence of the containers within the collating unit (**10**); and a control system (**28**) for controlling operation of the infeed conveyor (**16**), the collating unit conveyor (**20**), the guide arms (**24**), and the sensors (**26**).

**21 Claims, 7 Drawing Sheets**



**US 6,910,601 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,088,038 | A | 7/1937 | Scott et al. | |
| 2,137,501 | A | 11/1938 | Myers | |
| 2,178,000 | A | 10/1939 | Slehrs | |
| 2,348,927 | A | 5/1944 | Runsvold et al. | |
| 2,690,856 | A | 10/1954 | Trondle | |
| 2,781,947 | A | 2/1957 | Webster et al. | |
| 2,929,532 | A | 3/1960 | Tonelli | |
| 3,045,864 | A | 7/1962 | Hurst et al. | |
| 3,069,654 | A | 12/1962 | Hough | |
| 3,166,117 | A | 1/1965 | Laverty | |
| 3,193,196 | A | 7/1965 | Merrill et al. | |
| 3,206,062 | A | 9/1965 | Rappaport | |
| 3,215,310 | A | 11/1965 | Hurst et al. | |
| 3,277,998 | A | 10/1966 | Medoff | |
| 3,368,713 | A | 2/1968 | Hurst et al. | |
| 3,400,857 | A | 9/1968 | Schubert | |
| 3,603,327 | A | 9/1971 | Buchholz et al. | |
| 3,677,437 | A | 7/1972 | Haigler | |
| 3,692,211 | A | 9/1972 | Flubacker | |
| 3,719,288 | A | 3/1973 | Schmitt et al. | |
| 3,746,211 | A | 7/1973 | Burgess, Jr. | |
| 3,782,590 | A | 1/1974 | Apfel | |
| 3,823,844 | A | 7/1974 | Linkemer et al. | |
| 3,837,139 | A | 9/1974 | Roseberg | |
| 3,871,156 | A | 3/1975 | Koenig et al. | |
| 3,885,702 | A | 5/1975 | Joslin et al. | |
| 3,917,045 | A | 11/1975 | Williams et al. | |
| 3,921,196 | A | 11/1975 | Patterson | |
| 3,985,264 | A | 10/1976 | Shaw et al. | |
| 3,997,063 | A | 12/1976 | Adams et al. | |
| 4,013,192 | A | 3/1977 | Pillon | |
| 4,018,358 | A | 4/1977 | Johnson et al. | |
| 4,247,019 | A | 1/1981 | Lerner | |
| 4,264,396 | A | 4/1981 | Steward | |
| 4,284,301 | A | 8/1981 | Geiger et al. | |
| 4,386,860 | A | 6/1983 | Price et al. | |
| 4,468,277 | A | 8/1984 | Kontz | |
| 4,476,381 | A | 10/1984 | Rubin | |
| 4,546,901 | A | 10/1985 | Buttarazzi | |
| 4,615,350 | A | 10/1986 | Boudville | |
| 4,660,824 | A | 4/1987 | Hermkens et al. | |
| 4,714,515 | A | 12/1987 | Hoffmann | |
| 4,753,473 | A | 6/1988 | Arnett | |
| 4,787,803 | A | 11/1988 | van Elten et al. | |
| 4,803,487 | A | 2/1989 | Willard et al. | |
| 4,810,230 | A | 3/1989 | Shirasawa | |
| 4,811,764 | A | 3/1989 | McLaughlin | |
| 4,812,629 | A | * 3/1989 | O'Neil et al. ............... 235/383 |
| 4,835,372 | A | 5/1989 | Gombrich et al. | |
| 4,851,072 | A | 7/1989 | Kontz | |
| 4,857,716 | A | 8/1989 | Gombrich et al. | |
| 4,868,409 | A | 9/1989 | Tanaka et al. | |
| 4,869,394 | A | 9/1989 | Hurst | |
| 4,872,803 | A | 10/1989 | Asakawa | |
| 4,902,263 | A | 2/1990 | Ito et al. | |
| 4,918,604 | A | 4/1990 | Baum | |
| 4,954,817 | A | 9/1990 | Levine | |
| 4,958,280 | A | 9/1990 | Pauly et al. | |
| 5,007,085 | A | 4/1991 | Greanias et al. | |
| 5,033,785 | A | 7/1991 | Woolley, Jr. | |
| 5,082,268 | A | 1/1992 | Santoro | |
| 5,194,857 | A | 3/1993 | Gomez | |
| 5,208,762 | A | 5/1993 | Charhut et al. | |
| 5,323,677 | A | 6/1994 | Knutson | |
| 5,332,275 | A | 7/1994 | Conway et al. | |
| 5,335,664 | A | 8/1994 | Nagashima | |
| 5,337,919 | A | 8/1994 | Spaulding et al. | |
| 5,348,061 | A | 9/1994 | Riley et al. | |
| 5,401,059 | A | 3/1995 | Ferrario | |
| 5,453,759 | A | 9/1995 | Seebach | |
| 5,463,839 | A | 11/1995 | Stange et al. | |
| 5,481,265 | A | 1/1996 | Russell | |
| 5,493,805 | A | 2/1996 | Penuela et al. | |
| 5,512,879 | A | 4/1996 | Stokes | |
| 5,562,232 | A | 10/1996 | Pearson | |
| 5,597,995 | A | 1/1997 | Williams et al. | |
| 5,621,384 | A | 4/1997 | Crimmins et al. | |
| 5,629,981 | A | 5/1997 | Nerlikar | |
| 5,671,592 | A | 9/1997 | Yuyama et al. | |
| 5,682,032 | A | 10/1997 | Philipp | |
| 5,700,998 | A | 12/1997 | Palti | |
| 5,706,026 | A | 1/1998 | Kent et al. | |
| 5,713,485 | A | 2/1998 | Liff et al. | |
| 5,713,487 | A | 2/1998 | Coughlin | |
| 5,718,525 | A | 2/1998 | Bruhnke et al. | |
| 5,720,154 | A | * 2/1998 | Lasher et al. .................. 53/411 |
| 5,762,235 | A | 6/1998 | Coughlin | |
| 5,771,657 | A | 6/1998 | Lasher et al. | |
| 5,781,511 | A | 7/1998 | Yasukawa et al. | |
| 5,797,515 | A | 8/1998 | Liff et al. | |
| 5,798,020 | A | 8/1998 | Coughlin et al. | |
| 5,812,410 | A | 9/1998 | Lion et al. | |
| 5,832,296 | A | 11/1998 | Wang et al. | |
| 5,845,264 | A | 12/1998 | Nellhaus | |
| 5,860,563 | A | 1/1999 | Guerra et al. | |
| 5,873,488 | A | 2/1999 | Guerra | |
| 5,883,370 | A | 3/1999 | Walker et al. | |
| 5,884,806 | A | 3/1999 | Boyer et al. | |
| 5,897,024 | A | 4/1999 | Coughlin et al. | |
| 5,903,225 | A | 5/1999 | Schmitt et al. | |
| 5,907,493 | A | 5/1999 | Boyer et al. | |
| 5,959,530 | A | 9/1999 | Lupien, Jr. et al. | |
| 5,963,453 | A | 10/1999 | East | |
| 6,006,946 | A | 12/1999 | Williams et al. | |
| D418,494 | S | 1/2000 | Robb | |
| 6,036,017 | A | 3/2000 | Bayliss, IV | |
| 6,036,812 | A | 3/2000 | Williams et al. | |
| 6,039,251 | A | 3/2000 | Holowko et al. | |
| 6,070,140 | A | 5/2000 | Tran | |
| 6,075,189 | A | 6/2000 | Robb | |
| 6,085,938 | A | 7/2000 | Coughlin | |
| 6,119,737 | A | 9/2000 | Yuyama et al. | |
| 6,155,485 | A | 12/2000 | Coughlin et al. | |
| 6,161,721 | A | 12/2000 | Kudera et al. | |
| 6,206,590 | B1 | 3/2001 | Thomas et al. | |
| D440,570 | S | 4/2001 | Schneider | |
| 6,225,988 | B1 | 5/2001 | Robb | |
| 6,249,277 | B1 | 6/2001 | Varveris | |
| 6,310,542 | B1 | 10/2001 | Gehlot | |
| 6,318,630 | B1 | 11/2001 | Coughlin et al. | |
| 6,320,570 | B1 | 11/2001 | Robb | |
| 6,343,711 | B1 | 2/2002 | Coughlin | |
| 6,346,886 | B1 | 2/2002 | De La Huerga | |
| D458,933 | S | 6/2002 | Schneider | |
| 6,421,584 | B1 | 7/2002 | Norberg et al. | |
| 6,477,442 | B1 | 11/2002 | Valerino, Sr. | |
| 6,478,185 | B2 | 11/2002 | Kodama et al. | |
| 6,526,158 | B1 | 2/2003 | Goldberg | |
| 6,533,480 | B2 | 3/2003 | Schneider | |
| 6,564,104 | B2 | 5/2003 | Nelson et al. | |
| 6,574,580 | B2 | 6/2003 | Hamilton | |
| 6,575,596 | B2 | 6/2003 | Butt | |
| 6,578,734 | B1 | 6/2003 | Coughlin | |
| 6,587,090 | B1 | 7/2003 | Jarra | |
| 6,592,005 | B1 | 7/2003 | Coughlin et al. | |
| 6,600,418 | B2 | 7/2003 | Francis et al. | |
| 6,624,739 | B1 | 9/2003 | Stobbe | |
| 6,692,211 | B2 | 2/2004 | Yuyama et al. | |
| 6,695,207 | B1 | 2/2004 | Norris, Jr. | |
| 6,703,918 | B1 | 3/2004 | Kita | |
| 6,724,690 | B1 | 4/2004 | Endo et al. | |

# US 6,910,601 B2

Page 3

| 6,774,796 | B2 | 8/2004 | Smith |
| 2003/0142588 | A1 | 7/2003 | Kawatahara |

## FOREIGN PATENT DOCUMENTS

| JP | 4174061 | | 6/1992 |
| JP | 6127635 | | 5/1993 |
| JP | 6315521 | | 11/1994 |
| JP | 7187165 | | 7/1995 |
| JP | 8007058 | | 1/1996 |
| JP | 8115376 | | 5/1996 |
| JP | 9034964 | | 2/1997 |
| JP | 9202301 | | 8/1997 |
| JP | 9231342 | | 9/1997 |
| JP | 09259344 | A | 10/1997 |
| JP | 11296727 | A | 10/1997 |
| JP | 10059336 | | 3/1998 |
| SU | 918086 | | 4/1982 |
| WO | 9422580 | | 10/1994 |
| WO | 9529455 | | 11/1995 |
| WO | 9809598 | | 3/1998 |

## OTHER PUBLICATIONS

Coughlin, Michael E.; U.S. Appl. No. 09/457,286; filed Dec. 8, 1999; Automatic Dispensing System for Unit Medicament Packages.

Knutsen, Bernhard P.; U.S. Appl. No. 10/869,595; filed Jun. 16, 2004; RFID Tag and Method of User Verification.

Fred Levit, Daniel Garside; Computer–Assisted Prescription Writing; Dec. 30, 1976.

National Institutes of Health; Prescription–Writing with a PC; Jun. 10, 2003.

Packaging Week Interpak; Integrated Cartoning and Labeling System; Jul. 1996.

Roerig, CS; Assembly Automation; Automatic Pharmaceutical Inspection; 1993.

Alton Rosemary; Assembly Automation; Verification of Automated Pack Assembly; 1993.

Chain Store Age Executive; Longs Drug Stores' Systems Prescription; Dec. 1996.

Ukens, Carol; Drug Topics; Rx Description of Product Label Aids Accuracy.

McHugh, James A.; Phillips, Alexander J.; Computers in Healthcare; Managed–Care Pharmacy: An Integrated MIS Approach.

JICST; Development of a Printing System of Drug Envelope Labels with Personal Computer and Experience of Its Usage.

Journal of Public Policy & Marketing; Comprehension Testing for OTC Drug Labels; Goals, Methods, Target Population, and Testing Environment.

Kalsher, Michael J.; Proceedings of the Human Factors and Ergonomics Society; Enhancing the Perceived Readability of Pharmaceutical Container Labels and Warnings: the Use of Alternative Designs and Pictorials.

Fluid Phase Equilbria; Pharmaceutical Container Labels: Enhancing Preference Perceptions with Alternative Designs and Pictorials.

Department of Clinical Pharmacy; A Survey of Prescription Label Preferences Among Community Pharmacy Patrons.

American Journal of Hospital Pharmacy; Effect of Call–In Prescription Refill System on Workload in an Outpatient Pharmacy.

Department of Mathematical Statistics and Operation Research; Retail Pharmacy Activities and Their Automation by Bar Code Recorder, Tablet Counter and Remote Computer.

Bohsel Pharmacy Co. Ltd.; Computerized Prescription Checking System.

Business Forms, Labels & Systems; Label/Tag.

Converting Magazine; A Prescription for Supplying the Pharmaceutical Industry.

Ursula Jones; How to Get More from your Label.

American Society of Consultant Pharmacist; White Paper on Automation in Pharmacy.

* cited by examiner



FIG. 1

Case: 13-1561 Case: PARTICIPANTS ONLY Document: 30 Page: 73 Page: 73 Filed: 11/07/2013 Filed: 11/07/2013



FIG. 2



FIG. 3

A74



FIG. 4



FIG. 5



FIG. 6

Case: 13-1561 Case: PARTICIPANTS ONLY Document: 30 Page: 77 Filed: 11/07/2013



FIG. 7

FIG. 8

A77

Case: 13-1561 CASE PARTICIPANTS ONLY Document: 30 Page: 78 Filed: 11/07/2013



FIG. 9

A78

US 6,910,601 B2

1

# COLLATING UNIT FOR USE WITH A CONTROL CENTER COOPERATING WITH AN AUTOMATIC PRESCRIPTION OR PHARMACEUTICAL DISPENSING SYSTEM

## RELATED APPLICATION

This non-provisional utility application relates to and claims the priority benefit of U.S. provisional application entitled "COLLATING CONTROL CENTER," Ser. No. 60/394,589, filed Jul. 8, 2002, which is hereby incorporated into the present non-provisional application by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to automatic dispensing systems that are operable to automatically fill and label prescription vials or otherwise dispense pharmaceutical products to be labeled and dispensed as prescriptions to patients. More particularly, the invention relates to a collating unit operable to automatically store prescription containers dispensed from an automatic dispensing system for subsequent retrieval by an operator.

### 2. Description of the Prior Art

Automatic dispensing systems ("ADSs"), such as the one disclosed in U.S. Pat. No. 5,337,919, have been developed to assist pharmacists in the filling and dispensing of prescriptions. ADSs are extremely helpful in automatically filling prescription vials with medicaments or automatically dispensing unit-of-use packages containing medicaments. However, busy pharmacies often do not have enough pharmacists, technicians, or other operators available to retrieve and store the vials and packages, i.e. the prescription containers, as quickly as an ADS outputs the containers. It is therefore common for prescription containers to be lined up on an outfeed conveyor of the ADS, waiting for retrieval and storage by the operator. When the operator wishes to retrieve a particular patient's container, the operator must look at and read a label of each container on the outfeed conveyor until finding the correct container. This method of retrieving prescription containers is time-consuming and presents a possibility for error, since the operator may easily pick up the wrong container in search of the patient's container. If the patient has several filled prescriptions corresponding to several containers, the operator must look through even more containers for the patient's containers. Further, if the ADS is filling the containers faster than the operator can retrieve the containers, place caps on the containers that are filled prescription vials, and store the containers, then the operator may likely store the containers on a counter top in the pharmacy. This presents the possibility of containers becoming disorganized, or of even more concern, containers being knocked over. If the containers are filled prescription vials, then since the vials are not yet capped when they exit the ADS, then medicaments may spill from toppled vials onto the counter top or onto the floor. Further, there is the possibility other items may inadvertently be placed in the vials, such as other medicaments or particulates, such as dust accumulated on the counter top or floor.

If the pharmacy does provide multiple pharmacists, technicians, or other operators to retrieve and store the prescription containers exiting the ADS, one or more persons are necessarily moving around the outfeed conveyor of the ADS. Since the area around the conveyor is relatively small, these persons are likely to bump into each other or otherwise cause a disruptive work environment. Further,

2

with multiple persons retrieving the containers, the containers may become misplaced, or the contents of filled prescription vials may be spilled. It is also possible that one or more of the containers dispensed for a given patient may be retrieved by one operator while other container(s) for the same patient may be retrieved by another operator. This may cause confusion, and when this happens, the patient may inadvertently leave the pharmacy without all of the required prescription containers. Requiring additional operators for managing retrieval and storage of the containers also increases the overall operating costs of the pharmacy.

Once the operator finds the correct container for the patient, the container is usually packaged in a bag having a label identifying the patient's name for whom the container is intended, a prescription number for the prescription associated with the container, and other relevant and identifying information for the prescription. If the patient requires multiple containers, all containers would normally be packaged in the same bag. A prescription label for each prescription stored in the bag is then normally stapled to the bag. The bag is then stored, normally in alphabetical order, in a bin or other storage receptacle. As bags for various patients are stored in the bin, the bags are bunched together, which often makes it difficult to find a bag for a particular patient. Further, if a bag is mistakenly placed in the bin out of alphabetical order, upon retrieval of the bag, the operator is required to conduct a more extensive search of the stored bags for the desired bag.

If the patient has several prescriptions corresponding to several filled containers, all the containers should be packaged in the same bag for retrieval by the operator. However, it is common for multiple prescription containers to be packaged in separate bags for a variety of reasons. For example, if prescriptions are entered into a control system of the ADS at separate times, as opposed to being entered at approximately the same time, then the containers containing the prescribed medicament will exit the ADS at separate intervals. The operator retrieving the containers from the ADS outfeed conveyor will then likely package the containers as they exit the ADS, as opposed to retrieving a container for a patient, recognizing that other containers will be forthcoming from the ADS, and temporarily setting the retrieved container aside to wait for the other containers for the patient to exit the ADS. When the last container for the patient has exited the ADS, the operator must then retrieve all containers for the patient that have been set aside, package the containers in a bag, and store the bag in alphabetical order in the storage bin. If the operator sets aside multiple containers for multiple patients, the counter top of the pharmacy is likely to become full with prescription containers awaiting packaging, which increases the possibility of misplacing a container or of even more concern, incorrectly packaging a container in the wrong bag.

To alleviate some of the problems associated with retrieving dispensed prescription containers, ADSs are often provided with a control center or other end unit, wherein prescription containers filled with medicaments are conveyed to the control center via the outfeed conveyor of the ADS. Most prior art control centers are static in that they are simply a cabinet or handling station at which the operator retrieves a filled container from the outfeed conveyor, places a cap on the container if it is a filled prescription vial, packages the container in a bag or other package, and stores the container in a storage receptacle or bin based on a patient's name.

Automated control centers have been developed which are operable to automatically store the containers exiting the

US 6,910,601 B2

3 4

ADS. Such automated control centers commonly include a storage unit having a plurality of holding slots, holding areas, or other storage mechanism in which the prescription containers are stored. Unfortunately, prior art automated control centers are limited to storing only one prescription container per a slot or compartment. Additionally, prior art automated control centers store the container based on a prescription number associated with the container, as opposed to storing the container based on a patient name for whom the container is intended. This is especially inconvenient for several reasons. First, many patients now receive more than one prescription at a time, and thus, more than one prescription container will be associated with each patient. Since prior art automated control centers are only operable to store one container per a slot, an operator retrieving stored containers for a patient must retrieve containers from several different slots. Further, because the slots in which the containers for the patient are stored are not necessarily next to each other, or even proximate to each other, the operator is required to look for containers at several various locations within the storage unit.

Second, prior art automated control centers are only operable to store the container for the patient under the prescription number, and thus, any indicator for the slot in which the container is stored only displays the prescription number. The operator is then required to cross-reference the prescription number to the patient name by either viewing the prescription number on paperwork for the prescription, viewing the prescription number on the indicator for the slot, and determining if the numbers match, or viewing the prescription number on a display, such as a computer monitor, and matching the prescription number to the number on the indicator. This is time-consuming and prone to error since the operator must match prescription numbers that are often several digits in length.

As noted above, many ADSs already include static control centers. To automate the static control centers, the static control centers must either be completely replaced with automated control centers having storage units for storing the prescription containers, or the static control centers must be substantially modified to include the storage units. Extensive modification or replacement of the static control centers is required because the storage units for storing the prescription containers are normally large and bulky and include many structural items not found in existing static control centers. Therefore, prior art static control centers cannot be easily and inexpensively modified to include storage units for storing prescription containers.

Another limitation of prior art automated control centers is that they are not configured to simultaneously store both unit-of-use packages containing medicaments and filled prescription vials. This is especially problematic because many medicaments are now pre-packaged in unit-of-use packages, especially in Europe.

Further yet, prior art automated control centers are often relatively expensive, due to their large size and numerous features.

There is therefore a need for an automated storage unit configured to be easily used with an existing static control center. More particularly, there is a need for a storage unit that automatically stores a prescription container containing medicaments and dispensed from an automatic dispensing system for subsequent retrieval by an operator. There is also a need for a unit operable to store more than one container in a holding area. Additionally, there is a need for a unit operable to collate multiple containers for a patient in one holding area. Further, there is a need for a unit operable to store a container for a patient based on the patient's name, as opposed to a prescription number associated with the container. Additionally, there is a need for a unit that is configured to simultaneously store both prescription vials and/or packages containing medicaments in a staging area such that multiple prescriptions for a patient, whether in the form of prescription vials, unit-of-use packages, or a combination thereof, are grouped together for easy retrieval. Even further, there is a need for a unit that is relatively inexpensive.

SUMMARY OF THE INVENTION

The present invention solves the above-described problems and provides a distinct advance in the art of automated storage units for use with static control centers cooperating with automatic dispensing systems ("ADSs"). More particularly, the present invention provides a collating unit that may be used with an existing static control center to automatically store prescription containers, such as prescription vials and unit-of-use packages containing medicaments, exiting an ADS. The unit stores prescription containers according to a storage algorithm that is dependent on a patient name for whom a container is intended and an availability of an open storage position in the collating unit.

The collating unit of the present invention broadly includes an infeed conveyor, a base, a collating unit conveyor, a frame, a plurality of holding areas, a plurality of guide arms, a plurality of sensors, and a control system. The collating unit may be mounted in an opening formed in a counter top of an existing control center or, alternatively, a control center may be manufactured with the collating unit.

The infeed conveyor is preferably positioned on the counter top of the control center and may be an outfeed conveyor of the ADS. The base is preferably mounted within the opening in the counter top and extends into the cavity of the control center. The base is secured to the counter top and provides a stable support structure on which the collating unit conveyor may be mounted. The collating unit conveyor is mounted on the base and is positioned generally adjacent to the infeed conveyor.

The frame substantially surrounds the infeed conveyor and the base and collating unit conveyor. The frame includes a longitudinal slot positioned along a length of the frame, such that when the frame is positioned over the infeed and collating unit conveyors, the longitudinal slot is positioned over the infeed conveyor. The frame also includes the plurality of holding areas formed therein. Each holding area is positioned generally transverse to the longitudinal slot at an angle less than 90° to the longitudinal slot. Each holding area is generally U-shaped to include an open end and a closed end. The open end of each area is interconnected with the longitudinal slot. When the frame is positioned over the infeed and collating unit conveyors, the holding areas are positioned over the collating unit conveyor.

The plurality of guide arms are rotatably mounted to the base between the infeed conveyor and the collating unit conveyor and at the open end of each holding area. The rotation of each arm is driven by an individual guide arm motor in communication with the control system.

The plurality of sensors are operable to determine the presence of a container within the collating unit. Each sensor includes an infrared light emitting diode ("LED") and receiver. Sensors are positioned at an end of the longitudinal slot, at the closed end of each holding area, and along a length of the longitudinal slot proximate to the open end of each holding area.

US 6,910,601 B2

5

The control system controls operation of the infeed conveyor, the collating unit conveyor, the plurality of guide arms, and the plurality of sensors. The control system includes a computing device, such as a computer, an infeed conveyor controller, a collating unit conveyor controller, a guide arm controller for each guide arm, a sensor controller for each sensor, a central sensor controller, an input device, an indicia reader, and at least one display, such as a computer monitor. The control system is preferably integrated with a control system of the ADS.

The infeed conveyor controller controls operation of the infeed conveyor and specifically, is operable to instruct movement of an infeed conveyor motor. Similarly, the collating unit conveyor controller controls operation of the collating unit conveyor and is operable to instruct movement of a collating unit conveyor motor.

Each guide arm controller controls operation of its guide arm and specifically, controls operation of its guide arm motor. When a container is ready to be stored in the holding area, the control system instructs the guide arm motor, via the guide arm controller, to open and close the guide arm.

Each sensor is controlled by its sensor controller, and each of the sensor controllers is controlled by the central sensor controller. Thus, the central sensor controller is operable to transmit information to and receive information from each of the sensor controllers.

The input device may be a keyboard, keypad, fingerprint reader, mouse, etc. An operator of the collating unit uses the input device to input identifying information for a patient, such as the patient's name, into the control system to facilitate locating stored containers in the collating unit.

The indicia reader is preferably a bar code reader for scanning a bar code of a prescription for the patient. Paperwork for the prescription preferably includes the bar code identifying the prescription.

The display is preferably a flat screen computer monitor mounted on an outer face of the ADS for easy viewing by the operator.

In operation, a prescription for a patient is entered into the control system of the ADS along with identifying information for the prescription, such as the patient's name. The ADS then dispenses a container containing the prescribed medicament. The container is transported to the control center, and specifically to the collating unit, via the infeed conveyor. The control system next determines in which holding area to store the container. The selected holding area is dependent on whether previous containers for the patient have been stored in the collating unit and not yet retrieved. If containers for the patient have already been stored and not yet retrieved, the control system determines if the holding area has space to store the additional container. To accomplish this, the sensor positioned at the open end of the holding area determines if the holding area is full. If the holding area is not full, the container is stored in the holding area. If the holding area is full, or if no container for the patient has been stored and not yet retrieved, the control system selects the first empty holding area for storage of the container.

To store the container in the holding area, the infeed conveyor moves forward to transport the container to the open end of the selected holding area. As the container progresses to the holding area, the guide arm for the area opens outwardly into the path of the container. Based on the speed of the infeed conveyor and the sensor sensing the presence of the container, the control system knows when the container is positioned at the opening of the holding area.

6

Once the container is positioned at the opening of the holding area, the control system instructs the guide arm to close, which pushes the container into the holding area and onto the collating unit conveyor. To further transport the container to the closed end of the area, the control system instructs the collating unit conveyor to move forward. Since the holding area is positioned at an angle less than 90° to the longitudinal slot, the container is moved to the closed end of the holding area due to the forward progression of the collating unit conveyor.

When an operator of the collating unit desires to retrieve the container from the holding area, the operator may input the identifying information for the prescription, such as the patient's name, into the control system via the input device. Alternatively, the operator may scan the bar code on the paperwork of the prescription using the indicia reader. The control system then instructs an indicator positioned on either side of the frame proximate to the holding area to flash, which indicates the holding area location of the desired container.

By constructing a collating unit as described herein, numerous advantages are realized. For example, the collating unit of the present invention assists pharmacists or other operators in storing containers dispensed by an automatic dispensing system by automatically storing the containers, which significantly reduces the time necessary to manually retrieve and store the containers. Additionally, the collating unit eliminates errors associated with manual retrieval and storage of dispensed containers. Further, the collating unit eliminates the need for multiple pharmacists or operators to retrieve and store the containers, thus decreasing the operating costs of the pharmacy. Further yet, the collating unit is operable to store more than one prescription container per a holding area.

The collating unit is also operable to associate a stored container with a patient based on the patient's name. Further, the collating unit of the present invention can collate and store multiple containers for a patient within the same area. Further yet, the collating unit may be used with an existing control center and is relatively inexpensive, thus providing a pharmacy with an inexpensive, easy-to-install solution for collating and storing prescription containers, including prescription vials and unit-of-use packages, dispensed from an automatic dispensing system.

These and other important aspects of the present invention are described more fully in the detailed description below.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

A preferred embodiment of the present invention is described in detail below with reference to the attached drawing figures, wherein:

FIG. 1 is an isometric view of a collating unit constructed in accordance with a first preferred embodiment of the present invention and shown mounted on a control center cooperating with an automatic dispensing system ("ADS");

FIG. 2 is an exploded view of the collating unit, specifically illustrating an infeed conveyor, a collating unit conveyor, and a frame;

FIG. 3 is an isometric view of a base of the collating unit having the collating unit conveyor and a plurality of guide arms mounted thereon;

FIG. 4 is an isometric view of the frame of the collating unit, particularly illustrating a plurality of holding areas;

FIG. 5 is a plan view of the frame;

US 6,910,601 B2

7

FIG. 6 is a schematic of the components of a control system of the collating unit;

FIG. 7 is a flow diagram illustrating steps performed by the collating unit for storage of a prescription container;

FIG. 8 is a flow diagram illustrating steps performed by the collating unit when storing multiple prescription containers for a patient; and

FIG. 9 is an isometric view of two collating units constructed in accordance with a second preferred embodiment of the present invention, wherein prescription containers are routed on two infeed conveyors to the two collating units.

The drawing figures do not limit the present invention to the specific embodiments disclosed and described herein. The drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Turning now to the drawing figures, and particularly FIGS. 1, 2, and 6 a collating unit 10 constructed in accordance with a first preferred embodiment of the invention is illustrated. The collating unit 10 is provided for use with a control center 12 cooperating with an automatic dispensing system ("ADS") 14. The collating unit 10 is operable to automatically store filled prescription containers, such as prescription vials and unit-of-use packages containing medicaments, exiting the ADS 14 based on an organization scheme that accounts for identifying information of the container, such as a patient name for whom the container is intended or a prescription number of the container.

The collating unit 10 broadly comprises an infeed conveyor 16 for transporting the prescription containers from the ADS 14 to the collating unit 10; a base 18 housed within the control center 12 and positioned generally adjacent to the infeed conveyor 16; a collating unit conveyor 20 mounted on the base 18; a frame 21 substantially surrounding and covering the infeed conveyor 16 and the base 18; a plurality of holding areas 22 formed within the frame 21; a plurality of guide arms 24 mounted on the base 18 between the infeed conveyor 16 and the collating unit conveyor 20 and operable to maneuver the containers from the infeed conveyor 16 into the plurality of holding areas 22; a plurality of sensors 26 to sense the presence of the containers within the collating unit 10; and a control system 28 for controlling operation of the infeed conveyor 16, the collating unit conveyor 20, the guide arms 24, and the sensors 26.

As noted above, the present invention cooperates with the ADS 14, such as, for example, the SP 200 Robotic Prescription Dispensing System or the SP Unit Dispenser, both manufactured and sold by ScriptPro LLC of Mission, Kans. Various aspects of ADSs are embodied in U.S. Pat. Nos. 5,337,919, 5,713,487, and 5,762,235, and U.S. patent application Ser. No. 09/457,286, all of which are hereby incorporated by reference. Briefly, the ADS 14 receives prescriptions ("scripts") via a host computer. The scripts are then automatically filled, either by automatically filling a prescription vial or automatically dispensing a unit-of-use package containing medicaments. The filled vials or packages, i.e. the containers, are transported, via an outfeed conveyor 31, to the control center 12, where an operator retrieves the containers from the outfeed conveyor 31, places caps on the containers that are prescription vials, and stores the containers in a predetermined storage unit or packages the containers for receipt directly by customers. The control center 12 is commonly a cabinet, table, or other housing structure 32

8

that houses caps for the vials, a printer, a scanner, a keyboard drawer, and other necessary supplies. A counter top 34 encloses a top of the cabinet 32 and provides a surface on which the outfeed conveyor 31 may be positioned. The control center 12 is thus a workstation from which a pharmacist, technician, or other operator may retrieve the containers from the outfeed conveyor 31 and manually store them in the predetermined storage unit.

The present invention may be positioned on the counter top 34 of the control center 12 and housed partially inside the cabinet 32 of the control center 12. To prepare the existing control center 12 for receipt of the collating unit 10 of the present invention, an opening 36 must be formed or cut in the counter top 34. The opening 36 allows access to a inside cavity 38 of the control center 12, where the printer, scanner, and other supplies are housed. Alternatively, a new counter top (not shown) for the control center 12 may be provided already having the opening 36 formed therein. Thus, the collating unit 10 of the present invention provides an automatic container storage unit that may be used with existing control centers 12. The collating unit 10 automatically stores containers exiting the ADS 14 by patient, prescription, or other predetermined storage scheme without input or handling by the operator.

The infeed conveyor 16 is preferably positioned on the counter top 34 of the control center 12 and extends from the ADS 14. In preferable form, the infeed conveyor 16 is also the outfeed conveyor 31 of the ADS 14, such that the outfeed conveyor 31 extends onto the counter top 34 of the control center 12. Alternatively, the infeed conveyor 16 may be positioned substantially adjacent to an end of the outfeed conveyor 31 of the ADS 14, such that containers being transported on the outfeed conveyor 31 continuously move onto the infeed conveyor 16 without interruption and without toppling or otherwise displacing the containers. Preferably, the infeed conveyor 16 extends a length of the collating unit 10 to transport containers to various locations in the collating unit 10.

As illustrated in FIG. 2, the infeed conveyor 16 includes a conveyor base 40 having a horizontal base section 42 preferably formed of metal. A pair of spaced-apart, transversely-extending rollers 44 are rotatably mounted to the conveyor base 40. A conveyor belt 46 is trained over the rollers 44 so that the belt 46 covers and rides over the horizontal base section 42. The rightmost roller 44, as viewed in FIG. 2, serves as a drive roller that is driven by a belt or chain 48 rotated by an infeed conveyor motor 50. The infeed conveyor motor 50 is in communication with the control system 28, as described in more detail below.

Turning to FIGS. 1, 2, and 3, the base 18 is positioned within the opening 36 in the counter top 34 and partially housed within the cavity 38 of the cabinet 32 of the control center 12. The base 18 is substantially rectangular in horizontal cross-section and extends the length of the collating unit 10, such that the base 18 is positioned generally adjacent to the infeed conveyor 16. The base 18 includes first and second supporting members 52,54 for supporting the collating unit 10, as illustrated in FIG. 3. The first supporting 52 member is preferably substantially rectangular in vertical cross-section and provides a support structure on which the second supporting member 54 is positioned. The second supporting member 54 is generally U-shaped in vertical cross-section. The shape of the second supporting member 54 forms a wide, hollow trough, the purpose of which will be described below. A leg 56 of the second supporting member 54 is provided with a securing plate 58 fitted at a general 90° angle to the leg 56. The securing plate 58

US 6,910,601 B2

9

includes a plurality of holes 60 through which screws, bolts, or other securing fasteners may be guided to secure the base 18 to the counter top 34 of the control center 12. As such, the base 18 fits primarily within the cavity 38 of the control center 12, except for the securing plate 58, which lies flat against and is secured to the counter top 34. The base 18 is preferably formed of metal or other suitable material capable of providing a stable support structure for the collating unit 10.

The collating unit conveyor 20 is mounted within the hollow trough of the second supporting member 54 of the base 18, such that a top of the collating unit conveyor 20 is generally even with a top of the infeed conveyor 16. The collating unit conveyor 20 is generally similar to the infeed conveyor 16 in that the collating unit conveyor 20 includes a horizontal base section 62, a pair of spaced-apart, transversely-extending rollers 64 rotatably mounted to the horizontal base section 62, and a conveyor belt 66 trained over the rollers 64 so that the belt 66 covers and rides over the horizontal base section 62. The rightmost roller 64, as viewed in FIG. 3, serves as a drive roller that is driven by a belt 68 or chain rotated by a collating unit conveyor motor 70. The collating unit conveyor motor 70 is positioned within the cavity 38 of the control center 12 and is in communication with the control system 28, as described in more detail below.

Turning now to FIGS. 4 and 5, the frame 21 preferably substantially surrounds the infeed conveyor 16 and the base 18 and collating unit conveyor 20 and abuts up against the ADS 14, as best illustrated in FIG. 1. The frame 21 may be secured to the infeed conveyor 16 and base 18 or may be sized to simply fit over the infeed conveyor 16 and base 18. The frame 21 includes a longitudinal slot 72 generally extending a length of the frame 21. When the frame 21 is positioned over the infeed conveyor 16 and base 18, the longitudinal slot 72 is substantially positioned over the infeed conveyor 16. The longitudinal slot 72 preferably includes an open end 74 and a closed end 76, and the open end 74 preferably abuts up against an opening in the ADS 14 through which the containers are transported, as illustrated in FIG. 1. Thus, as the containers are transported on the infeed conveyor 16, the containers are also guided within the longitudinal slot 72 of the frame 21. The frame 21 is preferably formed of plastic or other lightweight material, such as aluminum.

As with the longitudinal slot 72, the plurality of holding areas 22 are preferably formed in the frame 21. Each holding area 22 is generally U-shaped, and each area 22 is interconnected with the longitudinal slot 72, as best illustrated in FIGS. 4 and 5. Each area 22 preferably includes an open end 80 and a closed end 82, and the open end 80 of each area 22 is preferably positioned adjacent to the longitudinal slot 72. When the frame 21 is positioned over the infeed conveyor 16 and the base 18, the holding areas 22 are substantially positioned over the collating unit conveyor 20 mounted on the base 18, as illustrated in FIG. 2. In preferable form, the frame 21 includes six holding areas 22 generally arranged parallel to each other, although fewer or more areas 22 are possible depending on the size of the frame 21. Importantly, the holding areas 22 are preferably formed at an angle less than 90° to the longitudinal slot 72, as opposed to the holding areas 22 being formed substantially perpendicular to the longitudinal slot 72, the purpose of which will be described below. The holding areas 22 are also advantageously sized to accommodate both prescription vials and unit-of-use packages containing medicaments, such that the collating unit 10 may store both vials and packages simultaneously in the holding areas 22.

10

The plurality of guide arms 24 are rotatably mounted on the base 18 between the infeed conveyor 16 and the collating unit conveyor 20, as illustrated in FIG. 2. Each guide arm 24 is mounted at the open end 80 of each holding area 22, such that each guide arm 24 separates each holding area 22 from the longitudinal slot 72, as illustrated in FIGS. 1, 4, and 5. Thus, the collating unit 10 preferably has one guide arm 24 for each holding area 22 for a total of six guide arms 24.

The rotation of each guide arm 24 is driven by an individual guide arm motor 84, such that each guide arm 24 is operable to rotate outwardly into the longitudinal slot 72. Each guide arm motor 84 is in communication with the control system 28, as described in more detail below. As a container exits the ADS 14 and travels on the infeed conveyor 16 through the longitudinal slot 72, the control system 28 determines in which holding area 22 to store the container, as described in more detail below. The guide arm 24 for the selected holding area 22 opens via the guide arm motor 84, such that the container is guided within the holding area 22. As the guide arm 24 closes, the container is substantially moved within the holding area 22, as also described in more detail below.

The plurality of sensors 26 sense the presence or location of containers stored in the collating unit 10, as described in more detail below. Each sensor 26 preferably includes at least one infrared light emitting diode ("LED") 86 and at least one receiver 88, such that infrared energy emitted by the LED 86 is received by the receiver 88, as illustrated in FIG. 4. If an object, such as a container, is located in a path of the energy emitted from the LED 86, then the energy will reflect off of the object and be received by the receiver 88, thus indicating the presence of the object. In contrast, if no object is in the path of the emitted energy, then the energy has no object off of which to reflect or alternatively, the reflecting energy is measurably reduced. Therefore, little or no energy is received by the receiver 88, which indicates that no object is within the path of the energy emitted by the LED 86.

Sensors 26 are positioned at the closed end 76 of the longitudinal slot 72, at the closed end 82 of each holding area 22, and along the length of the longitudinal slot 72 proximate to the open end 80 of each holding area 22, as illustrated in FIGS. 2 and 4. Although infrared LEDs 86 and receivers 88 are described, the sensors 26 may include any conventional optical-type sensor having an optical emitter and an optical detector. The use and operation of the sensors 26 will be described in more detail below with respect to the operation of the collating unit 10.

Turning now to FIGS. 6, 7, and 8, the control system 28 of the present invention controls operation of the collating unit 10 and is integrated with a control system 90 of the ADS 14. The control system 90 of the ADS 14 receives data corresponding to prescriptions inputted to the host computer 30. The host computer 30 may be any pharmacy computer running a pharmacy automation program such as provided by Zadall Computer Systems. With respect to the collating unit 10 of the present invention, the control system 28 communicates with and controls operation of the infeed conveyor 16, the collating unit conveyor 20, the plurality of guide arms 24, and the plurality of sensors 26.

The control system 28 broadly includes a computing device 92, such as a computer, an infeed conveyor controller 94, a collating unit conveyor controller 96, a guide arm controller 98 for each guide arm 24, a sensor controller 100 for each sensor 26, a central sensor controller 102 for controlling operation of each of the individual sensor con-

US 6,910,601 B2

11

12

trollers **100**, an input device **104**, such as a keyboard, keypad, fingerprint reader, mouse, etc., and an indicia reader **106**, such as a bar code reader, and at least one display **108**, such as a computer monitor, that serves as an operator interface.

The computing device **92** may broadly comprise any processor capable of being programmed and preferably also includes a memory **110** on which at least one database **112** may be stored. The computing device **92** communicates with and controls operation of the other components of the control system **28**.

The infeed conveyor controller **94** controls operation of the infeed conveyor **16**. Specifically, the infeed conveyor controller **94** is in communication with the infeed conveyor motor **50** and is operable to instruct movement of the motor **50**. The infeed conveyor controller **94** receives instructions from the control system **28** on when to begin and end movement of the infeed conveyor **16**.

The collating unit conveyor controller **96** controls operation of the collating unit conveyor **20**. As with the infeed conveyor controller **94**, the collating unit conveyor controller **96** communicates with the collating unit conveyor motor **70** and receives instructions from the control system **28** on when to begin and end movement of the collating unit conveyor **20**.

Each guide arm controller **98** controls operation of its guide arm **24**. Specifically, each guide arm controller **98** controls operation of its guide arm motor **84** and thus, is in communication with its guide arm motor **84**. Each guide arm controller **98** receives instructions from the control system **28** on when to open and close its guide arm **24**, as described in more detail below.

Each sensor controller **100** controls operation of its sensor **26**, and, as noted above, the central sensor controller **102** controls operation of each sensor controller **102**. Thus, the central sensor controller **102** is operable to transmit information to and receive information from each sensor controller **100**. At predetermined intervals, the sensors **26** determine the presence of any stored containers within the collating unit **10**, as described below, and information on any sensed containers is transmitted to the control system **28** via the central sensor controller **102**.

Initially, a script is entered into the control system **90** of the ADS **14** by a pharmacist, technician, or other operator. When entering the script, the operator preferably also enters identifying information for the script, such as a patient's name. Additionally, the script is assigned a script number, wherein the script number identifies the particular patient name and medicament to be dispensed. Further, a unique bar code is associated with the script, and the bar code is preferably placed on any paperwork for the script, the purpose of which will be described below.

Once the script is entered into the control system **28**, the ADS **14** automatically dispenses a first initial container, wherein the container is either a prepackaged unit-of-use prescription package or a vial filled with the prescribed medicament. The ADS **14** then labels the container with the identifying information and bar code for the script and conveys the container to the collating unit **10** via the outfeed conveyor **31**, as described above. The control system **90** of the ADS **14** sends the script information to the control system **28** of the collating unit **10**, including the patient's name and the script number.

Before storing the first container in the collating unit **10**, the sensors **26** of the collating unit **10** determine if any object is stored or otherwise located in the collating unit **10**, as depicted in Box **7A** of FIG. **7**. Thus, the sensor **26** positioned at the closed end **76** of the longitudinal slot **72** determines if any object is located on the infeed conveyor **16**, and the sensors **26** positioned at the closed and open ends **80,82** of each holding area **22** determine if any object is located in any of the holding areas **22**. If the sensors **26** determine that an object is located in the collating unit **10**, such information is transmitted to the control system **28** via the central sensor controller **102**, and the control system **28** instructs an error message to be displayed on the display **108**, as depicted in Box **7B**. If the sensors **26** determine that no object is located in the collating unit **10**, the control system **28** instructs the first container exiting the ADS **14** to be stored in the collating unit **10**, as depicted in Box **7C**. Thus, the sensors **26** can determine if a prescription container from a previous use has not been removed from the collating unit **10** or if a foreign object has been placed in the collating unit **10**.

When the collating unit **10** is initially empty, the control system **28** instructs the first container exiting the ADS **14** be stored in the first available holding area **22**, i.e. the holding area **22** nearest to the ADS **14**. To store the container in the holding area **22**, the control system **28** instructs the infeed conveyor **16** to move forward, and the guide arm **24** for the selected holding area **22** to open. Once the guide arm **24** opens into the longitudinal slot **72** and into the path of the container, the container is prevented from being transported by the infeed conveyor **16** and is held in place in the longitudinal slot **72** by the guide arm **24**. The sensor **26** positioned at the open end **80** of the holding area **22** is then instructed to confirm that the container is located at the open end **80** of the holding area **22**. If the sensor **26** at the open end **80** does confirm the presence of the container, the control system **28** instructs the guide arm **24** for the area **22** to close, which consequently moves the container off of the infeed conveyor **16** and into the holding area **22** and onto the collating unit conveyor **20**. Once the guide arm **24** closes, the control system **28** instructs the collating unit conveyor **20** to move forward. Since the holding area **22** is formed at an angle within the frame **21**, as discussed above, forward movement of the collating unit conveyor **20** moves the container proximate to the closed end **82** of the holding area **22**. This allows room for other containers to be stored in the area **22** without disrupting or otherwise toppling the currently stored container.

As containers are stored in the collating unit **10**, the control system **28** of the collating unit **10** stores such information in the memory **110**. An operator of the collating unit **10** may at any time determine which containers are currently stored in the collating unit **10** and the location of the containers in the collating unit **10**. Further, the control system **28** stores the identifying information for each stored container in the memory **110**.

After the control system **28** instructs the first container to be stored in the holding area **22**, the control system **28** instructs an indicator **114** proximate to the area **22** to display the identifying information for the container, such as the patient name and script number, as illustrated in FIG. **4**. The indicator is preferably a vacuum fluorescent display and multiple indicators **114** are preferably secured to opposing sides of the frame **21**. The indicator **114** for each holding area **22** is preferably lit once a container is stored in the holding area **22**.

To store a second container in the collating unit **10**, the control system **28** first determines if the second container is for the same patient as the first container, as depicted in Box **8A** of FIG. **8**. If the second container is not for the same patient as the first container, the control system **28** will not

US 6,910,601 B2

13

store the second container in the same holding area **22** in which the first container was stored, since the control system **28** will not store containers for different patients in the same holding area **22**. Thus, the control system **28** instructs the second container to be stored in the first empty holding area **22**, as depicted in Box **8B**.

If the second container is for the same patient as the first container, the control system **28** determines if the first container for the patient has been retrieved or otherwise removed from the holding area **22**, as depicted in Box **8C**. The control system **28** determines if the first container has been removed from the holding area **22** by instructing the sensors **26** for the holding area **22** to determine if an object is located in the area **22**. Such information is transmitted to the control system **28** via the sensor controller **100** for the holding area **22** and the central sensor controller **102**. If the holding area **22** is empty, and thus, the first container has been removed, the control system **28** instructs the second container to be stored in the first empty holding area **22**, as depicted in Box **8D**.

If the first container for the patient has not been removed from the holding area **22**, the control system **28** determines if the holding area **22** storing the first container is full, as depicted in Box **8E**. In this example, since only one container has been stored in the collating unit **10**, namely the first container, the holding area **22** that is holding the first stored container will not be full. However, in operation, several containers may be stored in the collating unit **10**, and thus, it is possible the holding area **22** may be full. To determine if the holding area **22** is full, the sensor **26** positioned proximate to the open end **80** of the holding area **22** along the longitudinal slot **72** determines if any container is located proximate to the open end **80** of the holding area **22** and thus, if the holding area **22** is full. Since any previously stored container will be transported along the length of the holding area **22** due to the movement of the collating unit conveyor **20**, as discussed above, then if the sensor **26** positioned proximate to the open end **80** of the holding area **22** senses any container, the control system **28** knows the holding area **22** is full.

If the holding area **22** already storing containers for the patient is full, the control system **28** instructs the second container for the patient to be placed in the first empty holding area **22**, as depicted in Box **8F**. If the holding area **22** is not full, the control system **28** instructs the second container for the patient to be placed in the holding area **22** currently storing the first container for the patient, as depicted in Box **8G**.

The above process is repeated for each container exiting the ADS **14**. As noted above, as containers are stored in the collating unit **10**, the control system **28** tracks in which holding area **22** the container is stored and the patient for whom the container is intended. The control system **28** displays such information on the display **108** so that an operator of the collating unit **10** can quickly and easily determine the location of any container. When the operator desires to retrieve a container for a patient, the operator may locate the correct holding area **22** storing the prescription containers for the patient by any one of the following methods:

(1) find the correct holding area **22** storing the container for the patient from the information displayed on the indicator **114** associated with the holding area **22**;

(2) highlight the script on a display (not shown) of the ADS **14** using either an input device (not shown) or an indicia reader (not shown) of the ADS' control system **90**; or

14

(3) highlight the script on the display **108** of the collating unit's control system **28** using either the input device **104** or the indicia reader **106**.

Locating the holding area **22** by reading each indicator **114** may be time-consuming and error-prone. Therefore, the present invention allows the operator to highlight the locating information either using the input device **104** or the indicia reader **106** and either on the ADS' display (now shown) or the collating unit's display **108**. The display **108** is preferably a flat-screen computer monitor mounted on an outer face of the ADS **14**, as illustrated in FIG. 1. The method of the second and third options above are substantially similar, and therefore, only the third option will be described below.

To retrieve a container using a patient's name, for example, the operator may input the patient's name into the control system **28** by either typing the name using the keyboard, highlighting the name on the display **108** using the mouse, touching the name on the display **108** if the control system **28** includes touch-screen software, or any other suitable method. Preferably, the indicator **114** for the holding area **22** will flash, indicating the holding area **22** contains the identified container for the script. Alternatively, the operator may scan the bar code for the paperwork for the script using the indicia reader **106**, which also triggers flashing of the indicator **114**.

Upon retrieval or removal of the container from the holding area **22**, the control system **28** closes the script to indicate the container for the patient has been retrieved. If the patient has more than one container, the control system **28** does not close the script until all containers for the patient have been retrieved from the collating unit **10**. As a security feature, after retrieval of the containers from the holding area **22**, the sensors **26** associated with the holding area **22**, i.e. the sensors **26** positioned at the open and closed ends **80,82** of the holding area **22**, determine if any container is located in the area **22**. If a container is located in the holding area **22**, the control system **28** instructs an error message to be displayed on the display **108**. This alerts a busy operator that not all containers for the patient were retrieved. Upon removal of all containers from the holding area **22**, the control system **28** registers the holding area **22** as empty and operable to store additional containers.

In a second preferred embodiment, an ADS **14a** is operable to dispense both prescription vials and unit-of-use packages to multiple collating units, hereinafter referred to as first and second collating units **10a**, **10b**, via multiple infeed conveyors, hereinafter referred to as first and second infeed conveyors **16a**, **16b**, as illustrated in FIG. 9. The collating units **10a**, **10b** of the second preferred embodiment are substantially similar to the collating unit **10** of the first preferred embodiment. Similarly, the infeed conveyors **16a**, **16b** of the second preferred embodiment are substantially similar to the infeed conveyor **16** of the first preferred embodiment.

As illustrated in FIG. 9, the first infeed conveyor **16a** may be operable to transport prescription vials to the first collating unit **10a**, and the second infeed conveyor **16b** may be operable to transport prescription unit-of-use packages to the second collating unit **10b**. The first and second collating units **10a**, **10b** may be positioned such that the holding areas **22a,22b**, substantially similar to the holding area **22** of the first preferred embodiment, are generally head-to-head, although other arrangements are possible. Thus, the prescription vials for the patient may be routed to the holding area **22a** within the first collating unit **10a**, and the prescrip-

US 6,910,601 B2

15                                                                                  16

tion packages for the patient may be routed to the holding area **22***b* within the second collating unit **10***b*, wherein the holding areas **22***a*,**22***b* are adjacent or generally proximate to each other. The prescription containers for the patient are then generally grouped together for easy retrieval by the operator. More than two collating units **10***a*, **10***b* may be required for a busy pharmacy.

Alternatively, the first and second infeed conveyors **16***a*, **16***b* may transport the prescription containers and packages to one collating unit **10** (not shown in FIG. 9) substantially similar to the collating unit **10** of the first preferred embodiment, and the prescription vials and packages for each patient may be routed to the same holding area **22**.

The second preferred embodiment may be used with the ADS **14***a*, which is operable to dispense both prescription vials and prescription unit-of-use packages, as illustrated in FIG. 9. The ADS **14***a* preferably includes two separate dispensing machines with the collating units **10***a*, **10***b* positioned therebetween. For example, the leftmost dispensing machine is operable to dispense prescription vials via the first infeed conveyor **16***a* to the first collating unit **10***a*, and the rightmost dispensing machine is operable to dispense prescription packages via the second infeed conveyor **16***b* to the second collating unit **10***b*. Alternatively, the ADS **14***a* could be one single dispensing machine operable to dispense both prescription vials and packages and thus include multiple infeed conveyors **16***a*, **16***b* mounted within the dispensing machine (not shown in FIG. 9) and operable to feed to at least one collating unit **10**.

Although the invention has been described with reference to the preferred embodiment illustrated in the attached drawing figures, it is noted that equivalents may be employed and substitutions made herein without departing from the scope of the invention as recited in the claims. For example, a prescription container dimension sensor may be used with the collating unit **10** as a security feature to ensure that the container being stored in the collating unit **10** is the same container the control system **90** of the ADS **14** is expecting to be stored in the collating unit **10**. This prevents foreign objects placed in the collating unit **10** during the storing process mistakenly being recognized as a container exiting the ADS **14**. The container dimension sensor may be operable to recognize that the dimensions of the container to be stored do not match the expected dimensions provided by the control system **90** of the ADS **14**. Additionally, the collating unit **10** may include holding areas **22** of varying dimensions for holding containers of varying dimensions.

Further, prior art control centers may be manufactured with the collating unit **10**, as opposed to the above-described incorporation of the collating unit **10** with the existing control center **12**. Additionally, sensors **26** may be positioned on each guide arm **24** to further sense if a container is contacting the guide arm **24**.

Having thus described the preferred embodiment of the invention, what is claimed as new and desired to be protected by Letters Patent includes the following:

**1**. A collating unit for automatically storing prescription containers dispensed by an automatic dispensing system, the collating unit comprising:

a storage unit for storing the containers delivered by an infeed conveyor;

a plurality of holding areas formed within the storage unit for holding the containers;

a plurality of guide arms mounted within the storage unit and operable to maneuver the containers from the infeed conveyor into the plurality of holding areas; and

a control system for controlling operation of the infeed conveyor and the plurality of guide arms.

**2**. The collating unit as claimed in claim **1**, the storage unit including—

a base positioned generally adjacent to the infeed conveyor;

a collating unit conveyor mounted on the base; and

a frame substantially surrounding and covering the infeed conveyor and the collating unit conveyor.

**3**. The collating unit as claimed in claim **2**, wherein the infeed conveyor is an outfeed conveyor of the automatic dispensing system.

**4**. The collating unit as claimed in claim **3**, wherein the frame includes a longitudinal slot extending a length of the collating unit and formed within the frame such that when the frame is positioned over the infeed and collating unit conveyors, the longitudinal slot is generally positioned over the infeed conveyor.

**5**. The collating unit as claimed in claim **4**, wherein the holding areas are formed within the frame of the storage unit, such that when the frame is positioned over the infeed and collating unit conveyors, the holding areas formed within the frame are generally positioned over the collating unit conveyor.

**6**. The collating unit as claimed in claim **5**, wherein each holding area includes an open end and a closed end, and the open end of each area is interconnected with the longitudinal slot, such that each holding area is formed in the frame at an angle less than 90° with respect to the longitudinal slot.

**7**. The collating unit as claimed in claim **1**, further including a plurality of sensors mounted in the storage unit for sensing the presence of containers stored in the collating unit.

**8**. A collating unit for automatically storing prescription containers dispensed by an automatic dispensing system, the collating unit comprising:

an infeed conveyor for transporting the containers from the automatic dispensing system to the collating unit;

a collating unit conveyor positioned generally adjacent to the infeed conveyor;

a frame substantially surrounding and covering the infeed conveyor and the collating unit conveyor;

a plurality of holding areas formed within the frame for holding the containers;

a plurality of guide arms mounted between the infeed conveyor and the collating unit conveyor and operable to maneuver the containers from the infeed conveyor into the plurality of holding areas; and

a control system for controlling operation of the infeed conveyor, the collating unit conveyor, and the plurality of guide arms.

**9**. The collating unit as claimed in claim **8**, further including—

a base positioned generally adjacent to the infeed conveyor, wherein the collating unit conveyor is mounted on the base, and

a plurality of sensors mounted on the frame and operable to sense the presence of stored containers.

**10**. The collating unit as claimed in claim **9**, wherein the frame includes a longitudinal slot extending a length of the collating unit and formed within the frame such that when the frame is positioned over the infeed and collating unit conveyors, the longitudinal slot is generally positioned over the infeed conveyor.

**11**. The collating unit as claimed in claim **10**, wherein when the frame is positioned over the infeed and collating

US 6,910,601 B2

17

unit conveyors, the holding areas formed within the frame are generally positioned over the collating unit conveyor.

**12**. The collating unit as claimed in claim **11**, wherein each holding area includes an open end and a closed end, and the open end of each area is interconnected with the longitudinal slot, such that each holding area is formed in the frame at an angle less than 90° with respect to the longitudinal slot.

**13**. A collating unit for automatically storing prescription containers dispensed by an automatic dispensing system, the collating unit comprising:

an infeed conveyor for transporting the containers from the automatic dispensing system to the collating unit;

a base positioned generally adjacent to the infeed conveyor;

a collating unit conveyor mounted on the base;

a frame substantially surrounding and covering the infeed conveyor and the collating unit conveyor;

a plurality of holding areas formed within the frame for holding the containers;

a plurality of guide arms mounted on the base between the infeed conveyor and the collating unit conveyor and operable to maneuver the containers from the infeed conveyor into the plurality of holding areas;

a plurality of sensors positioned on the frame and operable to sense the presence of the containers stored in the collating unit; and

a control system for controlling operation of the infeed conveyor, the collating unit conveyor, the plurality of guide arms, and the plurality of sensors.

**14**. The collating unit as claimed in claim **13**, wherein the collating unit is configured for use with an existing control center cooperating with the automatic dispensing system.

**15**. The collating unit as claimed in claim **14**, wherein the infeed conveyor is an outfeed conveyor of the automatic dispensing system.

**16**. The collating unit as claimed in claim. **15**, wherein the base is positioned in an opening in a counter top of the control center.

**17**. The collating unit as claimed in claim **16**, wherein the frame includes a longitudinal slot extending a length of the

18

collating unit and formed within the frame such that when the frame is positioned over the infeed and collating unit conveyors, the longitudinal slot is generally positioned over the infeed conveyor.

**18**. The collating unit as claimed in claim **17**, wherein when the frame is positioned over the infeed and collating unit conveyors, the holding areas formed within the frame are generally positioned over the collating unit conveyor.

**19**. The collating unit as claimed in claim **18**, wherein each holding area includes an open end and a closed end, and the open end of each area is interconnected with the longitudinal slot, such that each holding area is formed in the frame at an angle less than 90° with respect to the longitudinal slot.

**20**. The collating unit as claimed in claim **19**, wherein sensors are positioned at an end of the longitudinal slot, at the closed end of each holding area, and at the open end of each holding area along a length of the longitudinal slot.

**21**. The collating unit as claimed in claim **20**, the control system including—

a computing device from which the control system may be operated,

an infeed conveyor controller for controlling operation of the infeed conveyor,

a collating unit conveyor for controlling operation of the collating unit conveyor,

a guide arm controller for controlling operation of each guide arm,

a sensor controller for controlling operation of each sensor,

a central sensor controller for controlling operation of each sensor controller,

an input device for inputting identifying information for the containers, such as a patient's name or a script number for each container, into the control system,

an indicia reader for reading a bar code associated with the container, and at least one display that serves as an operator interface.

* * * * *

US006910601C1

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (0223rd)

# United States Patent
Thomas et al.

(10) **Number:** US 6,910,601 C1

(45) **Certificate Issued:** Jan. 4, 2011

(54) **COLLATING UNIT FOR USE WITH A CONTROL CENTER COOPERATING WITH AN AUTOMATIC PRESCRIPTION OR PHARMACEUTICAL DISPENSING SYSTEM**

(75) Inventors: **Tracy I. Thomas**, Overland Park, KS (US); **Michael E. Coughlin**, Mission Hills, KS (US)

(73) Assignee: **Scriptpro LLC**, Mission, KS (US)

**Reexamination Request:**
No. 95/000,292, Sep. 4, 2007

**Reexamination Certificate for:**
Patent No.: 6,910,601
Issued: Jun. 28, 2005
Appl. No.: 10/615,503
Filed: Jul. 8, 2003

### Related U.S. Application Data

(60) Provisional application No. 60/394,589, filed on Jul. 8, 2002.

(51) **Int. Cl.**
*B65H 1/00* (2006.01)
*B65G 59/00* (2006.01)

(52) **U.S. Cl.** ...................................... 221/119; 700/244

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,642,117 A | 2/1972 | Burt |
| 3,955,678 A | 5/1976 | Moyer |
| 4,711,357 A | 12/1987 | Langenbeck |
| 5,208,762 A | 5/1993 | Charhut et al. |
| 5,620,102 A | 4/1997 | Finch, Jr. |
| 5,749,473 A | 5/1998 | Yamashita et al. |
| 5,771,657 A | 6/1998 | Lasher et al. |
| 5,963,453 A | 10/1999 | East |

FOREIGN PATENT DOCUMENTS

WO      WO 98/09598      3/1998

OTHER PUBLICATIONS

Case History (as of Jan. 9, 2008) for 2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc* in the U.S. District Court, District of Kansas.
2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 1—Complaint.
2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 1–2—Exhibit; U.S. Patent 6,910,601.
2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 2—Designation of Place of Trial.
2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 3—AO Form 120.
2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 3–2—Exhibit; U.S. Patent 6,910,601.

(Continued)

*Primary Examiner*—Beverly M. Flanagan

(57) **ABSTRACT**

A collating unit (**10**) for use with a control center (**12**) cooperating with an automatic dispensing system ("ADS") (**14**) for automatic storage of prescription containers dispensed from the ADS (**14**). The collating unit (**10**) broadly comprises an infeed convey or (**16**) for transporting the prescription containers from the ADS (**14**) to the collating unit (**10**); a base (**18**) housed within the control center (**12**) and positioned generally adjacent to the infeed conveyor (**16**); a collating unit conveyor (**20**) mounted on the base (**18**); a frame (**21**) substantially surrounding and covering the infeed conveyor (**16**) and the base (**18**); a plurality of holding areas (**22**) formed within the frame (**21**); a plurality of guide arms (**24**) mounted on the base (**18**) between the infeed conveyor (**16**) and the collating unit conveyor (**20**) and operable to maneuver the containers from the infeed conveyor (**16**) into the plurality of holding areas (**22**); a plurality of sensors (**26**) to sense the presence of the containers within the collating unit (**10**); and a control system (**28**) for controlling operation of the infeed conveyor (**16**), the collating unit conveyor (**20**), the guide arms (**24**), and the sensors (**26**).



# US 6,910,601 C1
Page 2

## OTHER PUBLICATIONS

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 4—Corporate Disclosure Statement.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 5—Entry of Appearance.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 6—Return of Service of Summons Executed.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 7—Answer to Complaint.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 8—Designation of Place of Trial.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 9—Corporate Disclosure Statement.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 10—Order Setting Scheduling Conference.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 11—Motion to Appear Pro Hac Vice Levy.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 11–2—Affidavit in Support Levy.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Docket Text for Document 12—Order on Motion to Appear Pro Hac Vice Levy.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 13—Answer to Counterclaim.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 14—Motion to Continue.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 15—Order on Motion to Continue.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 16—Motion to Appear Pro Hac Vice Shields.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 16–2—Affidavit in Shields.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 17—Motion to Appear Pro Hac Vice Wilkins.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 17–2—Affidavit in Support Wilkins.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 18—Affidavit in Support of Pro Hac Vice Motion Shields.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Docket Text for Document 19—Order on Motion to Appear Pro Hac Vice Shields and Wilkins.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 20—Protective Order.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 21—Scheduling Order.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 22—Certificate of Service.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 23—Motion for Leave.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 23–2—Amended Answer and Counterclaims.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Docket Text for Document 24—Order on Motion for Leave to File.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 25—Answer to Complaint.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 26—Certificate of Service.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 27—Answer to Counterclaim.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 28—Motion to Stay Case.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 29—Memorandum in Support of Motion.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 30—Certificate of Service.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Docket Text for Document 31—Order.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 32—Repsonse to Motion.

2:06–cv–02468–CM–JPO *ScriptPro LLC* v *Innovation Associates, Inc.;* Document 33—Order on Motion to Stay Case.

US 6,910,601 C1

1

**INTER PARTES
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 316**

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **8**, **9** and **13-16** is confirmed.

Claims **1**, **2** and **4** are determined to be patentable as
amended.

Claim **7**, dependent on an amended claim, is determined
to be patentable.

Claims **5**, **6**, **10-12** and **17-21** were not reexamined.

**1**. A collating unit [for automatically storing] *configured
to automatically store therein* prescription containers dis-
pensed by an automatic dispensing system, the collating unit
comprising:

a storage unit [for storing the] *configured to store in an
upright configuration a plurality of prescription* con-
tainers delivered by an infeed conveyor;

a plurality of holding areas formed within the storage unit
for holding the *plurality of prescription* containers *in an
upright configuration*;

a plurality of guide arms mounted within the storage unit
and operable to maneuver the *plurality of prescription*
containers from the infeed conveyor into the plurality
of holding areas, and

a control system for controlling operation of the infeed
conveyor and the plurality of guide arms;

*wherein the storage unit includes a frame raised above
and substantially surrounding at least a portion of at
least one of the infeed conveyor or another conveyor,
the plurality of holding areas being formed within the
frame for holding the plurality of prescription contain-
ers.*

**2**. [The collating unit as claimed in **1**.] *A collating unit for
automatically storing prescription containers dispensed by
an automatic dispensing system, the collating unit compris-
ing:*

2

a storage unit for storing the containers delivered by an
infeed conveyor;

a plurality of holding areas formed within the storage unit
for holding the containers;

a plurality of guide arms mounted within the storage unit
and operable to maneuver the containers from the
infeed conveyor into the plurality of holding areas; and

a control system for controlling operation of the infeed
conveyor and the plurality of guide arms;

*wherein* the storage unit [including—a base positioned]
*includes:*

*a collating unit conveyor* generally adjacent to the
infeed conveyor; and

[a collating unit conveyor mounted on the base; and]

a frame substantially surrounding and covering [the
infeed conveyor and] *at least a portion of* the collat-
ing unit conveyor, *the plurality of holding areas
being formed within the frame for holding the con-
tainers*.

**4**. [The collating unit as claimed in claim **3**.] *A collating
unit for automatically storing prescription containers dis-
pensed by an automatic dispensing system, the collating unit
comprising:*

a storage unit for storing the containers delivered by an
infeed conveyor;

a plurality of holding areas formed within the storage unit
for holding the containers;

a plurality of guide arms mounted with the storage unit
and operable to maneuver the containers from the
infeed conveyor into the plurality of holding areas; and

a control system for controlling operation of the infeed
conveyor and the plurality of guide arms;

*wherein the storage unit includes:*

*a base positioned generally adjacent to the infeed con-
veyor;*

*a collating unit conveyor mounted on the base; and,*

*a frame substantially surrounding and covering the
infeed conveyor and the collating unit conveyor;*

*wherein the infeed conveyor is an outfeed conveyor of the
automatic dispensing system; and*

wherein the frame includes is longitudinal slot extending
a length of the collating unit and formed within the
frame such that when the frame is positioned over the
infeed and collating unit conveyors, the longitudinal
slot is generally positioned over the infeed conveyor.

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit

*SCRIPTPRO, LLC v INNOVATION ASSOCIATES*, 2013-1561

## <u>CERTIFICATE OF SERVICE</u>

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LATHROP & GAGE LLP, attorneys for Appellants to print this document. I am an employee of Counsel Press.

On **November 7, 2013** counsel for Appellants has authorized me to electronically file the foregoing **Brief for Plaintiffs-Appellants** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

    Angela D. Mitchell
    Christine A. Guastello
    Basil T. Webb
    Shook, Hardy & Bacon, LLP
    2555 Grand Boulevard
    Kansas City, MO 64108
    Tel.: 816-474-6550
    Fax: 816-421-5547
    amitchell@shb.com
    cguastello@shb.com
    bwebb@shb.com

Additionally, paper copies will also be mailed to the above counsel when the copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

November 7, 2013                          /s/ Robyn Cocho
                                         Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains  9,191  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

     The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2007  in a 14 point Times New Roman font or

     The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

Dated: November 7, 2013            LATHROP & GAGE LLP

/s/ A. Justin Poplin
A. Justin Poplin
Counsel for Appellants